[No. 24932-8-III.    Division Three.    December 4, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. FLORENTINO S. BARAJAS, *Appellant*.

*Janet G. Gemberling* (of *Gemberling & Dooris, PS*), for appellant.

*Randy J. Flyckt, Prosecuting Attorney*, for respondent.

¶1 KULIK, J. — Florentino Barajas appeals his convictions for two counts of attempted first degree murder and one count of unlawful possession of a firearm. On appeal, Mr. Barajas asserts that the trial court abused its discretion when it denied him access to the master jury pool list for Adams County, that there was insufficient evidence of the essential element of premeditation, and that the prosecutor committed misconduct by using a derogatory term and by misstating the standard for premeditation to describe the nature of the defendant's intent.

¶2 We conclude that the trial court acted within its discretion in its initial ruling denying access to the master jury list, that there was sufficient evidence of premeditation, and that the prosecutor's comments—while improper—could have been remedied by a curative instruction. We affirm.

## FACTS

¶3 Deputy Dale Wagner was on routine road patrol when Florentino Barajas passed him driving a white pickup truck. Deputy Wagner recognized Mr. Barajas and was aware that Mr. Barajas was driving without a valid driver's license.

¶4 Deputy Wagner conducted a traffic stop. When the truck stopped, Mr. Barajas exited the cab and walked toward the front of the vehicle. Mr. Barajas was wearing a red jacket. Deputy Wagner ordered Mr. Barajas back into the truck. Mr. Barajas appeared agitated.

¶5 When asked for his license, registration, and proof of insurance, Mr. Barajas told the deputy that he "didn't have anything." III Report of Proceedings (RP) at 53. But he did provide Deputy Wagner with a birth certificate for a person named Jorge Alaniz. Mr. Barajas had previously been deported for a prior felony conviction and had reentered the United States illegally. Mr. Barajas testified that he pre-

sented the fake name and papers because he had already been deported and did not want to be deported again.

¶6 The deputy informed Mr. Barajas that he was being placed under arrest for driving without a valid driver's license. Mr. Barajas looked upset and kept saying "no" over and over. III RP at 56. Deputy Wagner ordered Mr. Barajas out of the truck.

¶7 Deputy Wagner ordered Mr. Barajas to put his hands on the truck where the deputy could see them. While Mr. Barajas was in this position, the deputy approached him from behind, tapped Mr. Barajas between the shoulder blades, and then backed away. Deputy Wagner stated that this tap was "[j]ust a touch to see the reaction." III RP at 122. In response, Mr. Barajas spun around and took a defensive stance. Mr. Barajas came at the deputy and took a swing with his fist.

¶8 The punch missed Deputy Wagner, who then reached for his baton. While the deputy tried to pull out his baton, Mr. Barajas raced back to the truck and drove away. Deputy Wagner pursued him. Other officers were called in for assistance.

¶9 Mr. Barajas drove into a driveway next to a house. Deputy Wagner pulled into the driveway behind the truck. Mr. Barajas got out of the truck and ran into the residence. Mr. Barajas went into the house to retrieve his gun. While he was inside the residence, he got his gun and loaded it with ammunition.

¶10 Deputy Wagner waited for backup to arrive outside of the residence. Deputy Jeffrey Lane was the first to arrive. The officers secured the other people who were present in front of the house. The officers believed that Mr. Barajas was still inside the house.

¶11 After securing the area, Deputy Wagner placed a telephone call to another officer. During this call, he observed Mr. Barajas running from the area behind the house and diving into a row of trees. Mr. Barajas was still wearing the red jacket.

¶12 A third officer, Officer Jerry Dobson, arrived. The three officers formulated a plan to bring Mr. Barajas into custody. The officers were concerned that Mr. Barajas had a weapon. In light of this concern, the officers decided that Deputy Wagner and Deputy Lane would approach Mr. Barajas's position with guns drawn, while Officer Dobson would stay behind at the house for containment purposes.

¶13 Deputy Wagner used an irrigation ditch to conceal his movement toward Mr. Barajas. Deputy Lane approached from the opposite direction. As they approached, both officers caught sight of Mr. Barajas's discarded red jacket.

¶14 Mr. Barajas was partially concealed in a shallow ditch near the tree line. He had piled tumbleweeds around himself in an attempt to hide. Mr. Barajas had his back turned to the officer when Deputy Wagner spotted him. Deputy Wagner ordered Mr. Barajas to show his hands. He made this order in both English and Spanish.

¶15 Coming from the opposite direction, Deputy Lane also saw Mr. Barajas partially hidden in the weeds. He also ordered Mr. Barajas to put his hands up.

¶16 Mr. Barajas sat up in the ditch and raised his hands. He appeared to be upset. Deputy Wagner ordered Mr. Barajas to roll out of the ditch, but Mr. Barajas refused to comply. Instead, Mr. Barajas pulled out a gun and aimed it at Deputy Lane.

¶17 Deputy Lane felt apprehensive and started to retreat. Mr. Barajas shot Deputy Lane in the chest and leg. Although Deputy Lane was wearing a bulletproof vest, he sustained injuries to his chest in addition to the gunshot wound to his left thigh.

¶18 Deputy Lane and Deputy Wagner opened fire. Mr. Barajas dropped back into the ditch while Deputy Wagner retreated toward the tree line. Deputy Wagner fell to the ground during his retreat. When Deputy Wagner turned around, he saw Mr. Barajas five or six feet away, aiming a gun at him. Deputy Wagner heard gunshots and opened fire on Mr. Barajas again.

¶19 Once Deputy Wagner returned fire, Mr. Barajas turned and ran toward a nearby equipment yard. Deputy Wagner ran to where Deputy Lane had been shot and assisted him back to the police vehicles to call for help.

¶20 Police set up a containment area to catch Mr. Barajas. He was eventually detained and questioned by police. During the recorded interrogation, Mr. Barajas admitted to shooting at Deputy Lane three times. But Mr. Barajas stated that he shot at the officer only because the officer shot at him first. Mr. Barajas also claimed that Deputy Wagner seemed very angry and had thrown Mr. Barajas up against his truck during the initial stop. Mr. Barajas was shot in the hand and the cheek during the gunfight.

¶21 Mr. Barajas was charged with two counts of attempted first degree murder and one count of first degree unlawful possession of a firearm.

¶22 Mr. Barajas made a motion to the trial court for a complete list of the names and addresses of all eligible jurors in Adams County. The reasons for requesting the list were the nature of the charged offenses, the publicity the case had received, and the constitutional right to a fair and impartial jury. As part of this request, Mr. Barajas told the court that he needed to determine the ethnic background of the Adams County jury pool so he could compare the jury pool with the ethnic background of the county at large. While the trial court suggested that defense counsel might attempt to obtain the list directly from the Office of the Administrator for the Courts (OAC), the court made no final ruling at the first hearing.

¶23 Without obtaining the trial court's official permission, Mr. Barajas's counsel proceeded to contact the OAC to request a copy of the master jury pool list. The OAC provided the master list on a compact disc (CD) to the Adams County Superior Court clerk. The CD was then given to another employee of the court, who gave a copy to Mr. Barajas's counsel.

¶24 Shortly after Mr. Barajas's counsel printed the list from the CD, the trial court sent Mr. Barajas an e-mail informing him that the master list CD contained private information and directed counsel to return the CD to the court. Counsel did so.

¶25 The State requested a hearing to consider Mr. Barajas's receipt of the master list of potential Adams County jurors without court permission. The State requested this hearing to determine whether improper access to the master jury list occurred, what information was obtained by Mr. Barajas, and what sanctions, if any, would be appropriate. The State also requested that Mr. Barajas's defense counsel be disqualified from representing him. The State asserted that defense counsel committed jury tampering when he obtained the master jury list without court permission.

¶26 The trial court found that it was a violation of GR 18 and GR 31 for defense counsel to obtain the master jury list without a court order. While these rules were violated, the trial court concluded that this violation did not warrant sanctions or the removal of defense counsel. But the trial court did warn defense counsel that it "[did not] want these things happening anymore." RP (Oct. 17, 2005) at 71. The court further stated that it would impose sanctions for any future violation of GR 18 or GR 31.

¶27 At the hearing, the trial court invited defense counsel to address the jury list issue at a future time. Defense counsel did not do so. At the close of the State's case, Mr. Barajas made a motion to dismiss both counts of attempted first degree murder. He asserted that the State failed to prove the element of premeditation. The trial court denied the motion.

¶28 Mr. Barajas took the stand in his own defense. He testified that when he was initially stopped by Deputy Wagner, he was unaware that the deputy had attempted to pull him over, and that he stopped in order to make some repairs to his truck. Upon realizing that there was a police officer behind him, Mr. Barajas claimed that he attempted

to comply with the officer's orders. But the officer appeared to be very angry and aggressive. When Mr. Barajas saw the officer place his hand on his weapon, Mr. Barajas decided to get in his truck and attempt to get away. Mr. Barajas denied attempting to hit Deputy Wagner during this encounter.

¶29 Mr. Barajas then stated that he decided to drive home so he could get his gun in order to defend himself. He testified that he attempted to hide beneath the tumbleweeds and brush because he was scared and did not know what to do. According to Mr. Barajas, Deputy Lane shot him first, and it was only then that Mr. Barajas made a move for the gun that he had retrieved from his house. Mr. Barajas stated that he thought the police officers were going to kill him.

¶30 During closing arguments, the prosecutor[1] attempted to delineate the concepts of planning, intent, and premeditation for the jury. In doing so, the prosecutor made several statements that analogized Mr. Barajas's behavior to that of a dog. With regard to intent and premeditation, the prosecutor stated:

> A good way to think about it is this; even the mangie [sic], mongrel mutt can intend to if you touch their food bowel [sic] while they are eating, they bite you. Their intent is get away from my food.
>
> Now, some people may well say that a good bird dog can plan. Do you have a good bird dog? They always seem to flush that bird out where there is nothing in the sky but blank sky. That dog might be able to plan, but that is not what we are required to prove to you, just that you touch my food, I bite you.
>
> You try to deport me, try to arrest me, I hurt you. You try to arrest me at the scene after that traffic stop, I take a swing at you.

IX RP at 27-28.

¶31 Mr. Barajas did not object to the prosecutor's remarks. Mr. Barajas himself employed the prosecutor's anal-

---

[1] The court notes that the Adams County Prosecutor's Office did not serve as trial counsel.

ogy to argue that he was acting out of instinct rather than premeditation.

¶32 Mr. Barajas was convicted of two counts of attempted first degree murder and one count of first degree unlawful possession of a firearm. He appeals.

## ANALYSIS

■ ■ ¶33 *Access to Jury Information.* The Sixth and Fourteenth Amendments provide criminal defendants with the right to be tried by a jury that is representative of the community. *See State v. Hilliard*, 89 Wn.2d 430, 440, 573 P.2d 22 (1977). A criminal defendant has no constitutional right to a jury comprised in whole, or in part, of persons of his or her own race. *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). But criminal defendants do have a constitutional right to "be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Id.* at 85-86.

■ ¶34 The defendant must prove the systematic exclusion of members of the defendant's own racial group from the jury venire to establish a constitutional violation. *Id.* at 94. The burden to prove that the jury selection system used at trial was constitutionally invalid is on the challenger. *Hilliard*, 89 Wn.2d at 440.

¶35 The issue of whether Mr. Barajas was provided with a jury pool that was representative of his community is not before this court. Mr. Barajas does not argue that this right was violated. He does, however, argue that the trial court erred at the initial hearing when it denied him access to a document that could potentially establish a constitutional violation. Mr. Barajas also asserts the court erred when it admonished Mr. Barajas's counsel for his attempts to obtain a copy of the master jury list.

■ ■ ¶36 The Supreme Court has addressed the issue of whether a trial court errs when it fails to provide a master jury list that could potentially establish systematic exclu-

sion. *See State v. Cienfuegos*, 144 Wn.2d 222, 25 P.3d 1011 (2001). In *Cienfuegos*, the court noted that "nowhere in our jurisprudence is it suggested a bare allegation that the jury list is not representative is sufficient to bring this issue into play." *Id*. at 232. The decision further validated the method of creating master jury pool lists in Washington as being "broader and more inclusive than required by law." *Id*. Under this reasoning, the court rejected Mr. Cienfuegos's argument that the trial court erred when it refused to provide him with the master jury list so that he could establish systematic exclusion.

¶37 The decision in *Cienfuegos* is controlling. The trial court did not err when it refused to provide Mr. Barajas with a copy of the master jury pool list.

¶38 Mr. Barajas also asserts the trial court erred when it reprimanded defense counsel about obtaining the master jury list. It is not clear what remedy Mr. Barajas is seeking on this matter. The statements that Mr. Barajas objects to occurred outside of the sight or hearing of the jury and, therefore, could not have created any prejudice against Mr. Barajas at trial. The court's statements directed at defense counsel had no impact on the evidence presented at trial. While defense counsel may feel unfairly chastised for following what he understood to be the court's suggestion, there appears to be no legal wrong to remedy.

¶39 *Sufficiency of the Evidence of Premeditation.* This court reviews a challenge to the sufficiency of the evidence for whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the disputed element of the offense beyond a reasonable doubt. *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999) (quoting *State v. Pirtle*, 127 Wn.2d 628, 643, 904 P.2d 245 (1995)). " 'All reasonable inferences from the evidence must be drawn in favor of the state and interpreted most strongly against the defendant.' " *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006) (quoting *State v. Clark*, 143 Wn.2d 731, 769, 24 P.3d 1006 (2001)).

¶40 The premeditated intent to cause the death of another is an essential element of the crime of attempted first degree murder. *See, e.g., State v. Price*, 103 Wn. App. 845, 851, 14 P.3d 841 (2000). "Premeditation" is "the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991).

¶41 Premeditation may be proved by circumstantial evidence if substantial evidence supports the jury's finding and inferences from the facts are reasonable. *Finch*, 137 Wn.2d at 831. While the mere opportunity to deliberate is not sufficient to support a finding of premeditation, a wide range of facts can support the inference of premeditation. *Id.*

¶42 Motive, procurement of a weapon, stealth, and the manner of killing are all important facts that can support the finding of premeditation. *Pirtle*, 127 Wn.2d at 644. Circumstantial evidence that the defendant brought a weapon to the scene and fired multiple shots supports the reasonable inference of premeditation. *See Hoffman*, 116 Wn.2d at 83. The defendant's statements may be considered when determining whether the defendant acted with premeditation. *Id.* at 83-84.

¶43 Here, the State presented evidence that Mr. Barajas had a motive for his attempt to elude police and prevent them from putting him in custody. He was present in this country illegally and did not want to be deported again. There was evidence that Mr. Barajas obtained a weapon. Mr. Barajas admitted that he went into his house in order to retrieve his gun. The fact that Mr. Barajas took the time to load the weapon while inside the residence also indicates premeditation.

¶44 And Mr. Barajas tried to hide himself from the officers before shooting at them. A jury may consider evidence that the defendant attempted to hide himself from

the victim prior to the attack as evidence supporting the inference of premeditation. *See Pirtle*, 127 Wn.2d at 644.

¶45 The manner of the shooting and Mr. Barajas's statements also support the elements of premeditation. During the police interrogation, Mr. Barajas stated that he shot at least three times and was aiming at the body of one of the officers. Taken together, the evidence showed that Mr. Barajas went into his house to retrieve a gun, loaded it, attempted to hide himself from the officers, fired multiple shots, and admitted to aiming his gun at Deputy Lane's body while firing. This was sufficient evidence to support the jury's finding of premeditation.

¶46 *Prosecutorial Misconduct.* The prosecutor attempted to explain the concepts of intent and premeditation through the example of what the prosecutor termed a "mangie [sic], mongrel mutt." IX RP at 27. Mr. Barajas contends that the prosecutor's remarks constituted prosecutorial misconduct because they misinformed the jury and because likening the defendant's behavior to a mongrel dog was an appeal to the passions and prejudice of the jury.

¶47 In order to establish a claim of prosecutorial misconduct, Mr. Barajas must show that the prosecutor's remarks were both improper and prejudicial. *See State v. Roberts*, 142 Wn.2d 471, 533, 14 P.3d 713 (2000). Because Mr. Barajas failed to object to these comments at trial, he has waived his claim of prosecutorial misconduct unless this court finds that the prosecutor's remarks were so flagrant and ill intentioned that any prejudice flowing therefrom could not have been neutralized by a curative instruction to the jury. *See State v. Gentry*, 125 Wn.2d 570, 640, 888 P.2d 1105 (1995). This court reviews the prosecutor's remarks in the context of the total argument, the issues in the case, the evidence, and the instructions provided by the trial court. *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

¶48 *Misstatement of the Law.* It is generally improper for a prosecutor to misstate the law during closing argument. *See, e.g., State v. Davenport*, 100 Wn.2d 757, 765,

675 P.2d 1213 (1984). Here, the prosecutor argued to the jury that, in order to prove premeditation, the State merely had to prove that Mr. Barajas acted with the level of deliberation of a hungry dog trying to protect its food. This is not the correct standard for the State's burden of proof with regard to premeditation. As previously noted, the State was required to prove "the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *Hoffman*, 116 Wn.2d at 82-83.

¶49 Even though the prosecutor's remarks were improper because they did not convey a correct statement of the standard for premeditation, Mr. Barajas must also establish that these statements were so prejudicial that a curative instruction would have been ineffective. And he does not meet that burden.

¶50 The trial court provided the jurors with a correct statement of the legal standard of premeditation in its jury instructions. The trial court informed the jury that, in order to find the defendant guilty, the jury had to find that he had the premeditated intent to cause the deaths of the officers. The jury also had to find that the design to kill the officers was deliberately formed. Moreover, the jury was also instructed that they were to accept the statements of the law that were provided to them by the trial court and that they were to disregard any comments made by the attorneys that were contrary to the law as stated by the court.

¶51 The prosecutor's remarks at issue in this case were a small portion of his overall argument regarding premeditation. And this court presumes that the jury follows the instructions of the court. *State v. Grisby*, 97 Wn.2d 493, 509, 647 P.2d 6 (1982). Because the jurors were properly instructed by the trial court, and in light of the evidence supporting a finding of premeditation in this case, Mr. Barajas has not established that the prosecutor's remarks created an enduring prejudice that could not have been cured by an instruction from the trial court.

¶52 *Appeal to the Passions and Prejudice of the Jury.* Appeals by the prosecutor to the jury's passions and prejudice are inappropriate. *See, e.g., State v. Belgarde,* 110 Wn.2d 504, 507, 755 P.2d 174 (1988). The prosecutor has a duty to seek a fair trial. *State v. Suarez-Bravo,* 72 Wn. App. 359, 367, 864 P.2d 426 (1994). "In the interests of justice, a prosecutor must act impartially, seeking a verdict free of prejudice and based upon reason." *Id.* at 368. It is improper for a prosecutor to make statements that are calculated to align the jury with the prosecutor and against the defendant. *See State v. Reed,* 102 Wn.2d 140, 146-47, 684 P.2d 699 (1984) (quoting *People v. Fielding,* 158 N.Y. 542, 547, 53 N.E. 497, 14 N.Y. Cr. 34 (1899)).

¶53 Here, the prosecutor used the example of a "mangie [sic], mongrel mutt" who bites the hand of any person who comes too near the dog's food. Mr. Barajas likens these remarks to those in *State v. Rivers,* 96 Wn. App. 672, 673, 981 P.2d 16 (1999), where the prosecutor stated that the defendant was a predator and a jackal, and also compared the defendant to a hyena.[2]

¶54 The prosecutor's remarks in this case do not rise to the same level of impropriety or prejudice as those in *Rivers.* But they were improper. The terminology used by the State was derogatory. Of particular concern was use of the term "mongrel." Common usage of this term implies mixed race or breeding, and this term is frequently used as a disparagement. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1460 (1993); *State v. Hacheney,* 160 Wn.2d 503, 518, 158 P.3d 1152 (2007) (supporting use of dictionary definition where term is not otherwise defined at law). The prosecutor had already been made aware that the defendant had concerns that his race and national origin would be an issue at trial. By linking the defendant's behavior to that of a "mongrel mutt," the prosecutor ran the risk of

---

[2] In addition to making comparisons between the defendant and various predatory animals, the prosecutor in *Rivers* also referred to the defendant and witnesses at trial as the " 'pajama crowd' " because they testified in their jail garb. *Rivers,* 96 Wn. App. at 674.

engaging the passions and prejudice of the jurors, rather than making an argument based on the objective, relevant facts of the case.

¶55 The State correctly points out that it is common for both prosecutors and defense attorneys to make use of analogies in order to help the jury understand the law or the arguments of the parties. While this may be true, the frequency with which analogies are used as a tool is not a reason to give either party permission to make improper argument within those analogies. Prosecutors should be especially mindful of their choice of wording when the analogy is linked specifically to the defendant.

¶56 Despite the fact that the prosecutor's remarks were improper, Mr. Barajas cannot establish that they were so flagrant and ill intentioned that an instruction from the court could not have cured the prejudicial effect of the comments. First, the analogy between the "mangie [sic], mongrel mutt" and Mr. Barajas was an indirect one. Because the prosecutor was not stating directly that Mr. Barajas was a "mangie [sic], mongrel mutt," the prosecutor's statements did not amount to "testimony" as to matters outside of the record that were intended to prejudice the jury. *See Belgarde*, 110 Wn.2d at 507-09; *Rivers*, 96 Wn. App. at 674-76. These comments were not so flagrant and ill intentioned as to indicate that the prosecutor had abandoned "his proper role as a quasi-judicial officer and an advocate." *Belgarde*, 110 Wn.2d at 509.

¶57 Second, Mr. Barajas's counsel actually repeated the analogy in his own closing argument in an attempt to establish that Mr. Barajas was acting out of instinct and the need to defend himself. This attempt to turn the analogy minimized any prejudice that the prosecutor's remarks may have had on the jury. The use of this analogy by Mr. Barajas also indicates that he may not have considered it to be a highly prejudicial remark.

¶58 Finally, the remarks at issue were brief and were only a small component of the State's overall argument at trial. An instruction to the jury from the trial court to

disregard the prosecutor's improper characterizations could have neutralized any prejudice. *See Gregory*, 158 Wn.2d at 866. As such, this court cannot find that the prosecutor's remarks during closing argument warrant reversal of Mr. Barajas's convictions.

¶59 We affirm.

BROWN and STEPHENS, JJ., concur.

Reconsideration denied February 12, 2008.

Review denied at 164 Wn.2d 1022 (2008).