IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) | No. 37057-7-III |
| | ) | |
| JOSEPH ANDREW RICHMOND, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Petitioner. | ) | |

PENNELL, C.J. — The use of animal analogies at trial is problematic. Many animal comparisons operate as racist code. Others are simply dehumanizing. But there is no hard and fast rule. Not all animal analogies are inherently improper. When a particular analogy does not clearly convey an improper message, an appellate court should not be quick to find offense. Instead, deference is owed to the assessments of the trial court and counsel.

Joseph Richmond has filed a petition for relief from conviction, arguing for the first time that the State's prosecutor used an improper animal analogy during closing argument. Mr. Richmond fails to show the analogy was patently racist or dehumanizing. The analogy, which compared Mr. Richmond to a hornet's nest, was plausibly aimed at describing Mr. Richmond's erratic behavior. Given this possible interpretation, and Mr. Richmond's lack of objection at trial, post-conviction intervention is unwarranted. Mr. Richmond's request for relief from conviction is denied.

BACKGROUND

Joseph Richmond killed Dennis Higginbotham by striking him in the head with a two-by-four wooden board. The State prosecuted Mr. Richmond with felony murder predicated on first degree assault. At trial, Mr. Richmond claimed he was acting in self-defense, arguing Mr. Higginbotham was coming at him with a knife. The State countered that Mr. Richmond was the initial aggressor. The State presented evidence showing Mr. Richmond was angry and irrational at the time of the assault. As such, his behavior was not consistent with a claim of lawful self-defense.

In explaining its case, the prosecutor used a hornet's nest analogy. The prosecutor asked the jury, "have you ever heard the analogy, don't poke a hornet's nest with a stick[?]" 6 Report of Proceedings (Feb. 9, 2016) (RP) at 1117, *State v. Richmond*, No. 34157-7-III (Wash Ct. App.). "Well, ladies and gentlemen, Joe Richmond is a hornet's nest. And you don't need a stick to poke him to set him off." *Id.* The hornet's nest analogy was repeated at various times throughout summation. In addition to referring to Mr. Richmond as a hornet's nest, the prosecutor described Mr. Richmond as "king of the nest, "king of the world," and "irrational." *Id.* at 1118-19, 1123-24. The prosecutor's comments did not inspire a defense objection. The prosecutor concluded their thoughts

by arguing the "[d]efendant is charged with murder in the second degree and the state is asking you to find self-defense doesn't apply to the hornet's nest." *Id*. at 1134.

The jury convicted Mr. Richmond of felony murder, rejecting his self-defense claim. The conviction was upheld on appeal. *State v. Richmond*, 3 Wn. App. 2d 423, 437, 415 P.3d 1208 (2018).

Mr. Richmond has now filed a timely personal restraint petition (PRP). He argues for the first time that the hornet's nest analogy constituted prosecutorial misconduct. Mr. Richmond also makes several challenges to the court's jury instructions. In the published portion of this opinion we address Mr. Richmond's prosecutorial misconduct claim. Our analysis of the instructional issues is set forth in the unpublished portion of the opinion.

## ANALYSIS

To succeed on a claim of prosecutorial misconduct, the defendant must show both improper conduct and prejudice. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion). When a claim of misconduct is not raised at trial, the defense must additionally show the prosecutor's actions were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). The hurdles to obtaining relief

based on prosecutorial misconduct are purposefully high. Not every prosecutorial misstep merits remand. Deference is instead owed to the trial court's ability to oversee the administration of justice, defense counsel's judgment about whether an objection was worth raising, and a jury's ability to independently assess the merits of the case.

The first part of our prosecutorial misconduct analysis asks whether the State's conduct was improper. According to Mr. Richmond, animal analogies at trial are always inappropriate. He asks us to "take this opportunity to hold that a prosecutor's use of animal imagery to describe a defendant on trial has no place in closing argument." PRP at 15. We decline this invitation. Animal imagery can sometimes be improper, but not always. Context matters.

The most obvious problem with animal analogies is they can convey racist sentiments. We discussed this issue in *State v. Barajas*, 143 Wn. App. 24, 39, 177 P.3d 106 (2007). The *Barajas* prosecutor compared the defendant's conduct to that of a "mangie [sic], mongrel mutt." *Id.* These words tended to convey a derogatory message about someone being "mixed race." *Id.* As such, the prosecutor's argument had the capacity to cultivate juror bias and irrational thinking. Such racially charged rhetoric is insidious misconduct. *See McCleskey v. Kemp*, 481 U.S. 279, 309 n.30, 107 S. Ct. 1756,

4

95 L. Ed. 2d 262 (1987) ("prosecutorial discretion cannot be exercised on the basis of race"). It can never be condoned.[1]

Even when an animal analogy lacks racist connotations, it can send a dehumanizing message. Calling someone a snake or a rat conveys the idea that the person, regardless of race, does not merit full treatment as a human and, as a result, a jury need not be as concerned about the individual's rights or circumstances. Such derisive comments are improper. *See State v. Embry*, 171 Wn. App. 714, 754-55, 287 P.3d 648 (2012) (reference to group of defendants as a "'pack of wolves'"); *State v. Rivers*, 96 Wn. App. 672, 673, 981 P.2d 16 (1999) (The prosecutor referred to the defendant and his associates as predators, hyenas, and jackals.); *State v. Wilson*, 16 Wn. App. 348, 357, 555 P.2d 1375 (1976) (The prosecutor improperly "referred to the victim as 'that little angel' and to the defendant by a declaration, 'to call him a beast would insult the entire animal kingdom.' . . . 'I say that he is not fit to be a member of the human race.'").

But not all human-animal comparisons are racist or dehumanizing. Some analogies are positive. It is a compliment to say someone is lionhearted, eagle-eyed, or busy as a bee. Other analogies are negative, though not in a particularly dehumanizing way.

---

[1] We nevertheless upheld Mr. Barajas's conviction, reasoning the prosecutor's improper conduct was not prejudicial.

For example, calling someone a chicken has more to do with the anthropomorphism of gallinaceous birds than with human denigration. There are also analogies that are simply neutral. A politician who favors escalating military conflicts may be called a hawk; one with an opposite perspective being a dove. An official who is in the last portion of an elected term is a lame duck. An individual or group seeking to keep politicians (be they hawks, doves, lame ducks, or otherwise) accountable might be referred to as a watchdog.

As we recognized in *Barajas*, "it is common for both prosecutors and defense attorneys to make use of analogies in order to help the jury understand the law or the arguments of the parties." 143 Wn. App. at 40. There is no clear prohibition on the use of animal analogies as part of this endeavor. To the contrary, trial practice guides are known to suggest animal analogies as part of effective story telling techniques. *See, e.g.*, Tyron C. Moncriffe, *Storytelling and the Art of Persuasion*, THE CHAMPION, Nov. 2011, at 26, 28-29 (praising an analogy that characterizes the victim as a snake to explain self-defense); THOMAS A. MAUET, FUNDAMENTALS OF TRIAL TECHNIQUES 282 (3d ed. 1992) (suggesting analogizing a cooperating witness to a maggot who has infested a piece of fruit). Our case law defers to attorneys' choices of rhetorical devices and allows analogies so long as they do not suggest a defendant should be considered less than human. *See State v. Perry*, 24 Wn.2d 764, 769-70, 167 P.2d 173 (1946).

Unless an analogy conveys racist sentiment or is otherwise dehumanizing, we should give breathing room for attorneys to connect with jurors and try their cases. In addition, if a particular analogy is ambiguous, our appellate review should be guided by a presumption of good faith. *See State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011) ("A prosecuting attorney . . . presumptively acts with impartiality and in the interest of justice."); *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance."). When opposing counsel fails to object to an ambiguous animal analogy, we should be loath to second guess the proceedings and intervene.

Looking at the analogy here, nothing about a hornet's nest analogy places it outside the bounds of permissible trial argument. As Mr. Richmond concedes, the analogy carries no apparent racial implications. Nor is it particularly dehumanizing. Similar to what is true of lame duck or watchdog, the primary definition of a "hornet's nest" has to do with people, not animals: "a troublesome or hazardous situation" or "an angry reaction." MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/hornet's%20nest (last visited Mar. 12, 2021). While a hornet or hornet's nest is not an entirely positive comparison, the comparison appears to have more

7

to do with the anthropomorphism of stinging wasps than an attempt to suggest a person

compared to a hornet or a hornet's nest is less than human.

Nor did the hornet's nest analogy appear obviously improper when viewed in the

context of Mr. Richmond's trial. The prosecutor appears to have invoked the hornet's

nest analogy to explain Mr. Richmond's behavior in a way the jury might find relatable.

Not everyone has been exposed to individuals with quick, violent tempers. But most

people are familiar with the concept of an easily angered hornet. We do not doubt one

*could* read the hornet's nest analogy as improperly suggesting Mr. Richmond shared

an insect's inability to engage in the type of rational thought required for self-defense.

But this dehumanizing interpretation is far from obvious. Indeed, had the analogy been

obviously offensive, one would wonder why it took Mr. Richmond and his various

attorneys so long to raise this argument.

At worst, the propriety of the hornet's nest analogy was ambiguous. To the extent

the comparison appeared dehumanizing to those present at trial, it should have drawn an

objection. But there was none. Instead, defense counsel referenced the hornet's nest

analogy in their own summation. Arguing for self-defense, Mr. Richmond's attorney

urged the jury not to be "fooled by the words, 'the hornet's nest.'" RP at 1135. Counsel

argued self-defense still applies even if "you're a belligerent person" or "act like an ass

8

in public." *Id*.

The dissent appears to claim the State's argument was not ambiguous because the State told the jury that, even assuming Mr. Higginbotham came at Mr. Richmond with a knife, Mr. Richmond "possessed no right to fight back." Dissent at 10. The actual quote from summation is as follows: "Defendant is charged with murder in the second degree and the state is asking you to find self-defense doesn't apply to the hornet's nest— decided to stir things up himself. We're asking you to find him guilty of murder in the second degree." RP at 1134. We do not read this argument as unambiguously asserting self-defense does not apply because Mr. Richmond had the mental faculties of a hornet. Instead, we read this argument as plausibly conveying the idea that because Mr. Richmond was stirring himself up with anger, i.e. behaving in a way analogous to a hornet, he was not entitled to act in self-defense. This line of argument was proper.[2]

The ambiguity of the prosecutor's statements distinguishes this case from *State v. Loughbom*, 196 Wn.2d 64, 470 P.3d 499 (2020). In *Loughbom*, the prosecutor repeatedly characterized the State's case as part of society's "war on drugs." *Id*. at 70. Although

---

[2] It is unclear why the prosecutor's use of an animal analogy to describe Mr. Richmond's behavior was more dehumanizing than the insistence on calling him "Defendant" instead of his given name.

there was no objection to this statement at trial, our appellate cases had long prohibited this precise type of rhetoric. *Id.* at 70-71. On appeal, there was no dispute the prosecutor's statements were improper. The only issue was prejudice. *Loughbom* held that the misconduct was prejudicial because the statements were repeated and improperly appealed to the jury's civic concerns for addressing societal ills. *Id.* at 77-78.

Unlike *Loughbom*, Mr. Richmond has not shown the prosecutor's comments were improper. He therefore fails to satisfy the first hurdle of his prosecutorial misconduct claim. The request for relief from personal restraint based on prosecutorial misconduct is denied. Mr. Richmond's petition for relief is therefore dismissed.[3]

The panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

---

[3] According to the dissent, the "State told the jury that, assuming Dennis Higginbotham thrust toward Joseph Richmond with a knife, Higginbotham possessed the right to do so, and Richmond possessed no right to fight back." Dissent at 10. The actual quote from summation is as follows: "Defendant is charged with murder in the second degree and the state is asking you to find self-defense doesn't apply to the hornet's nest— decided to stir things up himself. We're asking you to find him guilty of murder in the second degree." RP at 1134.

In addition to his misconduct claim, Mr. Richmond makes three arguments regarding the trial court's jury instructions. Although defense counsel did not object to the instructions at trial, Mr. Richmond claims relief is still proper on the theory that his attorney's failure to object constituted ineffective assistance. We disagree with Mr. Richmond's criticism of the instructions. Consequently, his claim of ineffective assistance fails.

*Self-defense instruction*

Mr. Richmond claims the trial court's self-defense jury instruction was improper because it lowered the State's burden of proof. The instruction in question was based on WPIC 16.02. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02, at 234. (3d ed. 2008) (WPIC). It applies in the context of justifiable homicide and explains self-defense must be predicated on a reasonable belief the victim "intended to inflict death or great personal injury." Clerk's Papers (CP) at 103, *State v. Richmond*, No. 34157-7-III (Wash Ct. App.). According to Mr. Richmond, because he was charged with felony murder predicated on assault, the degree of threatened harm need not have been so severe. According to Mr. Richmond, the court should have issued an instruction under WPIC 17.02, which applies outside the homicide context.

11

This instruction explains self-defense is available so long as the defendant reasonably believed they were about to be injured.

The level of threat required for self-defense depends on a proportionality analysis. For example, if the victim threatens the defendant with harmful, but not life-threatening force, the defendant is justified in responding with the same. But the defendant is not entitled to escalate the level of violence and deploy life-threatening force. Such force is not proportionate and therefore unjustified. The proportionality rule applies regardless of whether the defendant is charged with assault, felony murder, or murder. In the context of felony murder, it is the level of harm deployed by the predicate felony that controls the applicable self-defense instruction. *See State v. McCreven*, 170 Wn. App. 444, 462-66, 284 P.3d 793 (2012).

The predicate felony at issue in Mr. Richmond's case was first degree assault. As the trial court instructed the jury, first degree assault requires intent to inflict great bodily harm and either the actual infliction of such harm or the risk of such harm through use of a deadly weapon or force. *See* former RCW 9A.36.011(1)(a), (c) (1997); CP at 97. Under the proportionality rule, in order for self-defense to excuse commission of first degree assault, the threat of harm posed by the victim must be akin to a first degree assault. A mere risk of injury is insufficient.

12

The self-defense instruction provided by the court was appropriately tied to the predicate crime of first degree assault. An instruction based on WPIC 17.02 would not have met this standard. The trial court properly issued an instruction under WPIC 16.02, which required a threat of harm akin to that used in first degree assault, and the instruction thus does not support Mr. Richmond's ineffective assistance of counsel claim.

*First degree assault instruction*

Mr. Richmond claims the court's first degree assault instruction was ambiguous because it did not clearly require the State to prove a mens rea for each alternative means of first degree assault. In other words, Mr. Richmond claims the jury may have convicted him for assaulting Mr. Higginbotham by any force or means likely to produce great bodily harm or death, but without intent to inflict great bodily injury.

We disagree with Mr. Richmond's criticisms. The first degree assault instruction advised the jury:

> A person commits the crime of assault in the first degree when, *with intent to inflict great bodily harm*, he or she *assaults* another and inflicts great bodily harm or *assaults* another with a deadly weapon or by any force or means likely to produce great bodily harm.

CP at 97 (emphasis added). The court also instructed the jury, "[a]n assault is an *intentional* touching or striking of another person that is harmful or offensive." *Id*. at 100 (emphasis added). These instructions made plain the State was obliged to prove intent

13

and the type of intent at issue was an intent to inflict great bodily harm. Mr. Richmond's

attorney did not render ineffective assistance by correctly refraining from objecting to this

instruction.

*Revived self-defense instruction*

Mr. Richmond's final claim is that his attorney performed deficiently by failing

to ask for a revived self-defense instruction. This argument is made in conjunction with

the fact that the court issued an initial aggressor instruction. Mr. Richmond points out

that, according to the State's theory of the case, Mr. Richmond withdrew from the initial

confrontation between himself and Mr. Higginbotham. Thus, Mr. Richmond argues that

regardless of whether he was the initial aggressor in this original confrontation, he was

allowed to respond to Mr. Higginbotham's show of force after the initial confrontation

came to an end.

The problem with Mr. Richmond's argument is that it mischaracterizes the facts

and arguments at trial. The State's theory was not that Mr. Richmond forfeited the right

of self-defense based on his initial confrontation with Mr. Higginbotham. Instead, the

State's initial aggressor argument was specific to the second interaction between the two

men. According to the State, Mr. Richmond initiated a second confrontation by running

out of his home, armed with a two-by-four. Mr. Richmond responded to this claim at trial

by disputing the State's facts. Mr. Richmond claimed Mr. Higginbotham was the one who initiated the second, fatal confrontation. According to Mr. Richmond, he only grabbed the two-by-four after Mr. Higginbotham came at him with a knife.

A theory of revived self-defense was not relevant to the parties' dispute over who started the second confrontation between Mr. Richmond and Mr. Higginbotham. Had the court issued a revived self-defense instruction, it likely would have only generated confusion. Defense counsel did not behave ineffectively in failing to request the instruction.

## CONCLUSION

Mr. Richmond has not demonstrated he is under unlawful restraint. The request for relief from personal restraint is denied. His petition for relief is therefore dismissed.

_____, C.J.
Pennell, C.J.

I CONCUR:

_____
Lawrence-Berrey, J.

15

No. 37057-7-III

FEARING, J. (dissent) — The State of Washington charged Joseph Richmond with second degree murder of Dennis Higginbotham, and, in response, Richmond argued self-defense. During trial, Richmond testified "he was in fear for his life on the night of the attack," "felt ganged up on by [Veronica] Dresp and her [two] companions," and "repeatedly told the trio they needed to leave." *State v. Richmond*, 3 Wn. App. 2d 423, 429, 415 P.3d 1208 (2018). Immediately before striking Dennis Higginbotham with a board, Higginbotham, according to Richmond, approached him in a fast manner, armed with a flashlight, and with what appeared to be a knife.

This court lacks a transcript of the State's opening statement at trial. Nevertheless, at the beginning of the State's closing, the prosecuting attorney commented to the jury that she referenced defendant Joseph Richmond as a "hornet's nest" during her opening.

> We talked in opening statement and I gave you the analogy, have you ever heard the analogy, don't poke *a hornet's nest* with a stick. Well, ladies and gentlemen, *Joe Richmond is a hornet's nest*. And you don't need a stick to poke him to set him off.

6 Report of Proceedings (RP) (Feb. 9, 2016) at 1117 (emphasis added). The State thus established the theme of a hornet's nest at the beginning of the trial. We do not know

how many times the prosecutor referenced a "hornet's nest" during opening statement.

Regardless, the State immediately returned to this leitmotif in its closing.

After returning to the "hornet's nest" theme at the beginning of the initial closing statement, the State employed the metaphor six more times during the first closing statement and the rebuttal closing. When totaling all of the known uses of the term, the State employed the malevolent moniker at least nine times during the trial. The State thereby enduringly assigned Joseph Richmond the sobriquet "hornet's nest."

The prosecuting attorney continued in her initial closing:

> He [Joseph Richmond] was angry that day. He decided in his mind that he had a superior right to that residence and he was not going to let Veronica [Dresp] in. Her phone, her keys, her belongings were there, and she didn't need a stick. Okay? He was set off. *He's the kind of hornet's nest* that you just walk by and it goes off.

6 RP (Feb. 9, 2016) at 1117-18 (emphasis added).

> Again, he's going to be the *king of the nest*.

6 RP (Feb. 9, 2016) at 1118 (emphasis added).

> *In the hornet's nest that Joseph Richmond lives in*, where he's the king of the world, he gets to decide who gets to be there.

6 RP (Feb. 9, 2016) at1119 (emphasis added).

> And this is the moment I want you to think about when you think about what's reasonable and what's happening in this situation. No one needed a stick to provoke the defendant. Why? 'Cause *he's a hornet's nest* and he had his own.

2

6 RP (Feb. 9, 2016) at 1125 (emphasis added). The State ended its opening summation

by asking the jury to reject self-defense as a matter of law because of Richmond's status

as a "hornet's nest."

> Defendant is charged with murder in the second degree and the state is asking you to find *self-defense doesn't apply to the hornet's nest—* decided to stir things up himself. We're asking you to find him guilty of murder in the second degree.

6 RP (Feb. 9, 2016) at 1134. In rebuttal, the prosecuting attorney intoned:

> Defense said Dennis [Higginbotham] was actively approaching, and he chose to make himself a combatant. Really? 5'4" skinny old Dennis, wants to pick a fight with *the hornet's nest Joe*?

6 RP (Feb. 9, 2016) at 1164 (emphasis added).

This court's majority mentions that trial defense counsel also referenced a

"hornet's nest" during his closing argument. Perhaps the majority writes such to justify

the State's animalistic nom de jour. Nevertheless, defense counsel only stated that the

prosecuting attorney had referred to Joseph Richmond as a "hornet's nest," in an effort to

defeat the unfair allusion. Counsel pleaded with the jury not to be "fooled by the words,

the 'hornet's nest.'" 6 RP (Feb. 9, 2016) at 1135.

This court should grant Joseph Richmond's personal restraint petition on two

grounds. First, the prosecution engaged in misconduct by constantly impugning Joseph

Richmond as a "hornet's nest." Second, trial defense counsel performed ineffectively by

failing to object to the State's repeated referral to Richmond as a "hornet's nest." I

address the law of both prosecutorial misconduct and ineffective assistance of counsel, in

the context of a personal restraint petition, before I apply the doctrines to the prosecution of Richmond.

First, I discuss prosecutorial misconduct. A personal restraint petitioner raising a prosecutorial misconduct claim must prove the misconduct was either a constitutional error resulting in actual and substantial prejudice or a fundamental defect resulting in a complete miscarriage of justice. *In re Personal Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). No Washington court has held that all instances of prosecutorial misconduct constitute a constitutional violation. Nevertheless, prosecutorial misconduct may deprive a defendant of the constitutional right to a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 165, 410 P.3d 1142 (2018).

When asserting prosecutorial misconduct in a personal restraint petition when the defendant did not object to the misconduct at trial, the petitioner must overcome three hurdles. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 166. First, he or she must show the prosecutor committed misconduct. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 166. Second, because the petitioner did not object during trial, the petitioner must show that misconduct was flagrant and ill-intentioned. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 166. Third, he or she must show the prosecutor's flagrant and ill-intentioned misconduct caused actual and substantial prejudice. *In re Personal Restraint of Phelps*, 190 Wn.2d 155, 166 (2018).

The personal restraint petition second requirement echoes the burden faced by the accused during a direct appeal when he or she did not object to the prosecutor's conduct during trial. Under these circumstances, the defendant must show that the misconduct was so flagrant and ill-intentioned that an instruction would not have cured the prejudice. *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020); *State v. Walker*, 182 Wn.2d 463, 477-78, 341 P.3d 976 (2015). When addressing this flagrant standard, this court does not focus on the prosecutor's subjective intent in committing misconduct, but instead on whether the defendant received a fair trial in light of the prejudice cause by the violation of existing prosecutorial standards. *State v. Walker*, 182 Wn.2d 463, 478. The prosecutor's conduct is reviewed in its full context. *In re Personal Restraint of Yates*, 177 Wn.2d 1, 58, 296 P.3d 872 (2013). We consider the broad context of the comments as part of the trial, the frequency of improper comments, the intended purpose of the prosecutorial remarks, and the type of case to determine whether incurable prejudice occurred. *State v. Loughbom*, 196 Wn.2d 64, 70 (2020).

Closing arguments are an opportunity for counsel to argue reasonable inferences from the evidence. *State v. Walker*, 182 Wn.2d 463, 476-77. Advocacy, however, has limits, and a prosecutor has the duty to subdue courtroom zeal, not add to it, in order to ensure the defendant receives a fair trial. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). Closing argument is not an opportunity to present derogatory depictions of the defendant. *State v. Walker*, 182 Wn.2d 463, 478 (2015). The prosecution should not use closing argument to inflame the passions of the jury with heated, partisan

5

comments. *State v. Rivers*, 96 Wn. App. 672, 675, 981 P.2d 16 (1999). Justice can be secured only when a conviction is based on specific evidence and not on rhetoric. *State v. Loughbom*, 196 Wn.2d 64, 69-70 (2020).

In 1946, in *State v. Perry*, 24 Wn.2d 764, 770, 167 P.2d 173 (1946), the Washington Supreme Court considered the propriety of a prosecutor comparing a defendant to a "'mad dog'" during closing arguments. The prosecutor also informed the jury that it had the "responsibility" to ensure that "you, your sisters and your daughters and your wives can walk the streets of Bremerton at night without being molested or attacked by *beasts* like" the accused. *State v. Perry*, 24 Wn.2d at 769. The *Perry* court held:

> [i]t is within the range of legitimate argument for the prosecuting attorney to characterize the conduct of the accused in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case.

24 Wn.2d at 770. The Washington Supreme Court found no misconduct and even remarked:

> [i]f the evidence produced by the state is to be believed, the brutality of the appellant could hardly have been exceeded by the rapacity of a mad dog or a beast.

24 Wn.2d at 770.

The Washington Supreme Court has never overruled *State v. Perry*. As late as 2012, the Supreme Court cited *State v. Perry* to support the premise that a prosecutor's comments did not engender "'inflammatory effect.'" *State v. Emery*, 174 Wn.2d 741,

6

763, 278 P.3d 653 (2012) (quoting *State v. Perry*, 24 Wn.2d 764, 770 (1946)).  I trust, however, that prosecutorial standards have been elevated since 1946.

Subsequent Washington Supreme Court and Court of Appeals opinions have found prosecutors improperly deployed similar invectives comparing defendants to animals.  In *State v. Music*, 79 Wn.2d 699, 716-17, 489 P.2d 159 (1971), *vacated in part on other grounds*, 408 U.S. 940, 92 S. Ct. 2877, 33 L. Ed. 2d 764 (1972), the court ruled improper the prosecutor's pejorative references to defendant as "mad dog."  In *State v. Embry*, 171 Wn. App. 714, 754-55, 287 P.3d 648 (2012), the court described, as ill-intentioned and flagrant, the prosecuting attorney's reference to the defendants as a "pack of wolves."  In *State v. Barajas*, 143 Wn. App. 24, 39, 177 P.3d 106 (2007), the prosecutor improperly compared the defendant's conduct to that of a "mangie [sic], mongrel mutt." (Alteration in original.)  In *State v. Rivers*, 96 Wn. App. 672, 673-76 (1999), this court classified, as prosecutorial misconduct, a prosecutor's inflammatory comparison of the accused and associates to "jackals," "hyenas," and "predators."  In *State v. Wilson*, 16 Wn. App. 348, 357, 555 P.2d 1375 (1976), this court characterized, as inflammatory and improper, a prosecutor's assertions that "to call [defendant] a beast would insult the entire animal kingdom" and that the defendant was "not fit to be a member of the human race."

I now discuss ineffective assistance of counsel.  Ineffective assistance of counsel gives rise to a constitutional claim.  As already written, when the petitioner in a personal restraint petition raises a constitutional error, he must demonstrate actual and substantial

prejudice resulting from the alleged error. *In re Personal Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). A petitioner who makes a successful ineffective assistance of counsel claim meets this burden. *In re Personal Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

A successful ineffective assistance of counsel claim requires the defendant to show that counsel's performance was deficient and prejudice resulting from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To show prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694. The accused need not establish that the verdict likely would have been different. Instead, a reasonable probability, in this context, is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. 668, 694. If a prosecutor engages in misconduct and defense counsel fails to object, counsel's performance is deficient. *In re Personal Restraint of Yates*, 177 Wn.2d 1, 61, 296 P.3d 872 (2013).

I move now to the facts of Joseph Richmond's personal restraint petition. This appeal has similarities to *State v. Loughbom*, 196 Wn.2d 64, 70 (2020), in which the Washington Supreme Court reversed a drug conviction against Gregg Loughbom because of prosecutorial misconduct when invoking the war on drugs. In each case, defense counsel did not object to the misconduct at trial. The subject of the prosecutor's comments in Joseph Richmond's petition differs from the topic in *Loughbom*.

Nevertheless, in both cases, the State's attorney repeated the misconduct numerous times and made the improper comments a refrain at trial. The State of Washington employed the theme of Joseph Richmond's being a "hornet's nest" from the beginning to the end of trial. The prosecuting attorney uttered the pejorative reference at least nine times, more times than the inflammatory remarks in *State v. Loughbom*. In both cases, previous Washington decisions gave the prosecuting attorney fair warning. Washington appellate decisions cautioned Joseph Richmond's prosecutor to avoid animalist metaphors.

Joseph Richmond's prosecutor committed misconduct when repeatedly comparing Richmond to a hornet's nest. Although the prosecuting attorney referred to a "hornet's nest," not a "hornet," the reference was intimately tied to the stinging insect. The nest poses danger only because of the many hornets inside. Hornets, the largest of eusocial wasps, fall inside the taxonomy Class Insecta and, in turn, Kingdom Animalia. The prosecutor sub-humanized Richmond as a member of the animal kingdom incapable of reason. The brickbat impugned Richmond's credibility.

The prosecutor's derogatory comparisons of Joseph Richmond to a hornet's nest were ill-intentioned and inflammatory. References to harmful animals are inflammatory by nature. I question whether curative instructions ever solve any prejudice to the defense, but a curative instruction would not have corrected the prejudice created here by the prosecutor's recurring references, and the prosecutorial misconduct deprived Richmond of a fair trial. The State presented a strong case of murder against Joseph

Richmond, but Richmond presented credible evidence of self-defense, a complete defense to the charge.

The State's attorney told the jury to reject Joseph Richmond's defense of self-defense because "self-defense doesn't apply to the hornet's nest." 6 RP (Feb. 9, 2016) at 1134. The State thereby sought to rob Richmond of his sole defense. Richmond did not need to prove self-defense. Instead, the State carried the burden of disproving self-defense beyond a reasonable doubt. *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020).

A person swats and smashes a buzzing hornet regardless of whether the hornet has attacked him or her because one presumes all hornets are dangerous. Killing the hornet as a precaution rather than in defense of an actual attack is justified. By using the hornet's nest metaphor, the State told the jury that, assuming Dennis Higginbotham thrust toward Joseph Richmond with a knife, Higginbotham possessed the right to do so, and Richmond possessed no right to fight back.

I do not know the race of Joseph Richmond, and I will accept, for argument's sake, that a "hornet's nest" carries no racial connotations. Nevertheless, no court has ever limited prosecutorial misconduct, when assailing the accused with animalistic behavior, to instances of racist references. A primary evil behind racism is that a class of people are condemned as subhuman. That same evil arises whenever the State excoriates the accused as being an animal.

I lack confidence in the verdict as a result of the State's inflammatory rhetoric that rendered the trial unfair. I also conclude that excellent trial defense counsel performed ineffectively when failing to object to the inflammatory name calling. No legitimate strategy excused the failure to object. This court should grant Joseph Richmond's personal restraint petition and remand for a new trial. Therefore, I respectfully dissent.

The majority's opinion impliedly condones the employment of rhetoric by the State. The jury should decide the guilt or innocence of the accused based on evidence, not exhortatory oratory.

I dissent:

_____
Fearing, J.

11