# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of<br>the Personal Restraint of<br><br>ALLEN EUGENE GREGORY,<br><br>Petitioner. | No. 53849-1-II<br><br>UNPUBLISHED OPINION |

MAXA, P.J. – In this personal restraint petition (PRP), Allen Eugene Gregory seeks relief from personal restraint imposed following his 2001 conviction for first degree aggravated murder of a woman who lived in his neighborhood. His neighbor was raped, robbed, and stabbed to death in her house in 1996. The case remained open until the police obtained a search warrant for Gregory's vehicle and obtained an order to take a blood sample from Gregory based on an allegation of rape in an unrelated case, for which Gregory was charged and convicted in 2000. The search warrant and the DNA match from the blood sample provided evidence that Gregory committed the 1996 murder. He was convicted of first degree aggravated murder and sentenced to death.

Gregory appealed both the rape and aggravated murder convictions. In a consolidated case, the Supreme Court in 2006 reversed the rape conviction, affirmed the aggravated murder conviction, and reversed the death sentence. On remand in 2012, Gregory again was sentenced to death for the aggravated murder conviction. He appealed the death sentence. In October

2018, the Supreme Court held that the death penalty was unconstitutional as applied and ruled that all death sentences would be converted to life in prison.

We hold that (1) Gregory is precluded from asserting his challenges to the search warrant and blood draw orders in a PRP because the Supreme Court addressed and rejected those claims in the two previous appeals, (2) the use of a stun belt on him during trial did not violate his constitutional rights, (3) he cannot show that the jury was infected by racial bias, (4) he waived his prosecutorial misconduct claim because he did not object at trial, and (5) there was no cumulative error. However, we hold that, as the State now concedes, the State cannot collect accrued interest from Gregory on a vacated legal financial obligation (LFO).

Accordingly, we deny Gregory's PRP regarding his conviction, but we remand for the trial court to remove the interest on the vacated LFO.

FACTS

*Background*

In 1996, GH was found dead in her house in Tacoma with multiple stab wounds. Semen was found in her anal and vaginal swabs, on her thigh, and on the bedspread. Jewelry and money were missing. The police suspected that Gregory, who lived near GH, was involved with the murder based on his inconsistent statements regarding his whereabouts at the time of the crime. However, they could not connect him with the crime.

In August 1998, a woman named RS informed the Tacoma Police Department (TPD) that a man later identified as Gregory had raped her. She stated that she got into a car with the man and that he displayed a buck knife before raping her three times. She said that he used a condom but the condom had broken. RS provided to the police a description of the car, several specific details regarding the car's interior, the license plate number, and a description of the assailant. RS had a history of working as a police informant.

The police identified Gregory as the owner of the car of the license plate number that RS had provided. After verifying that Gregory's car matched the specific details that RS had described, the police arrested him. The State charged Gregory with three counts of first degree rape.

*Search Warrant and Blood Draw Orders*

In connection with the rape case, the police requested a search warrant for Gregory's car. The search warrant affidavit contained the details about the rapes and Gregory's vehicle provided by RS as described above. A magistrate issued the warrant. In the search of Gregory's car, the police discovered a buck knife and a condom. The condom had the same lot number and expiration date as the condom wrapper that had been found in the area where RS had stated the rapes had occurred.

The State also filed a motion to compel Gregory to provide a blood sample for DNA testing. The motion incorporated by reference the search warrant affidavit for the warrant to search of Gregory's car. The trial court entered an order that authorized the blood draw (September 1998 blood draw order). Gregory's attorney approved the form of the order.

Gregory's blood was drawn pursuant to the September 1998 blood draw order. The Washington State Patrol Crime Laboratory (WSPCL) compared a sample of Gregory's blood to seminal fluid from RS's rape kit and concluded that there was a DNA match.

More significantly, the WSPCL and two other labs concluded that Gregory's DNA matched the semen found at GH's crime scene. The State then charged Gregory with first degree aggravated murder for GH's murder. The aggravated circumstance was murder in the course of first degree rape and first degree robbery. The State sought the death penalty.

In the rape case, Gregory moved to suppress the results of the September 1998 blood draw. He argued that the blood draw was not supported by probable cause. The trial court eventually denied the motion to suppress and found that Gregory's attorney had agreed to the September 1998 blood draw order, and ruled that there was probable cause for the blood draw.

In response to Gregory's motion to suppress, the State moved for a second blood draw and presented an affidavit that only contained information known to the State at the time it sought the September 1998 blood draw order. After finding sufficient probable cause, the trial court in January 2000 entered a second blood draw order (January 2000 blood draw order). Gregory's blood was drawn again pursuant to the January 2000 blood draw order. The DNA in that blood again matched the semen found at the GH crime scene.

In the aggravated murder case, Gregory filed a motion to suppress information obtained as a result of the two blood draw orders in the rape case. The trial court concluded that collateral estoppel required the conclusion that the September 1998 blood draw had been entered as an agreed order and that probable cause supported the January 2000 blood draw order. Therefore, the court denied Gregory's motion to suppress.

*Rape Trial and Conviction*

At the rape trial in 2000, Gregory asserted a consent defense. He testified that he had consensual sex with RS, who he claimed was working as a prostitute on the night of the incident. He stated that RS became upset with him after he refused to pay her more money after the condom broke and that she accused Gregory of rape in retaliation.

A jury convicted Gregory of three counts of first degree rape. He was sentenced to 331 months of total confinement. Gregory appealed his convictions and sentence.

*Use of Stun Belt*

During pretrial proceedings in the aggravated murder case, Gregory was placed in a stun belt for security reasons. The trial court held a hearing and found good cause to order Gregory to wear a stun belt.

At the beginning of the aggravated murder trial, Gregory asked the court to reconsider the prior ruling regarding the stun belt. The trial court reviewed the pleadings submitted by the parties and held a hearing regarding the application of the stun belt. The court made extensive findings of fact, including consideration of an escape attempt, Gregory's rape conviction and sentence, the existence of several *Hartzog*[1] factors, the discreetness of the stun belt, and alternatives to the use of a stun belt. The court concluded that the stun belt was the least restrictive means possible to ensure the safety of all persons in the courtroom while ensuring that Gregory would have a fair trial by giving him the appearance of being free from restraint. As a result, the court denied Gregory's motion for reconsideration.

*Aggravated Murder Conviction*

The aggravated murder case proceeded to a jury trial in 2001. The only two Black members of the jury pool were excused, one for hardship and one for cause. All members of the jury ultimately seated were white.

The trial court admitted into evidence the buck knife found in Gregory's car pursuant to the search warrant. A medical examiner testified that the knife could have inflicted GH's stab wounds. The trial court also admitted the evidence connecting Gregory's DNA to GH's crime scene. During opening statement and closing arguments, the prosecutors urged the jury to

---

[1] *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981).

"declare the truth." Report of Proceedings (RP) (Feb. 14, 2001) at 4076; RP (March 19, 2001) at 6700, 6806. Gregory did not object.

The jury convicted Gregory of first degree aggravated murder. In the penalty phase of the trial, the jury sentenced Gregory to death. Gregory appealed the aggravated murder conviction and his death sentence.

*First Appeal – Gregory* I

The rape and aggravated murder cases were consolidated on appeal. *State v. Gregory*, 158 Wn.2d 759, 811, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014) ("*Gregory* I"). The Supreme Court reversed the rape conviction, affirmed the aggravated murder conviction, but reversed the death sentence. *Id.* at 777-78.

The court reversed the rape conviction because the trial court erred when it declined to conduct an in camera review of the dependency files of RS's children that were open at the time of trial. *Id.* at 811. The court determined that the dependency files contained material impeachment evidence because they disclosed that RS had lied about her drug use and about her drug treatment. *Id.* at 798-99.

Gregory raised a number of arguments regarding his murder conviction, all of which the court rejected. *Id.* at 813-48. Relevant here, Gregory argued that both the September 1998 and January 2020 blood draws were improper and were not supported by probable cause. *Id.* at 821-22. The court held that sufficient evidence supported probable cause to draw Gregory's blood in January 2000 and that the blood draw was valid. *Id.* at 824-25. The court declined to address the September 1998 blood draw order because all the DNA evidence would have been inevitably discovered as a result of the valid January 2000 blood draw order. *Id.* at 825.

Gregory also argued that the prosecutor engaged in misconduct by "improperly denigrating defense counsel, arguing facts not in evidence, and improperly shifting the burden to the defense." *Id.* at 841. The court rejected these arguments. *Id.* at 841-46.

The court reversed the death sentence because (1) the penalty phase of the aggravated murder case relied on the rape conviction and (2) the prosecutor engaged in misconduct during closing arguments in the penalty phase of the murder trial. *Id.* at 777-78, 867. The court remanded for resentencing in the aggravated murder case. *Id.* at 778.

*Trial Court Proceedings After Remand*

Following remand, the State prepared for a new rape trial, but it was discovered during interviews with RS that she had lied at the first trial. Specifically, she now admitted she had agreed to commit two sex acts with Gregory in exchange for a fee, although she still claimed that a third sex act was forced. Based on RS's inconsistent statements regarding the rapes, the State moved to dismiss the rape charges in August 2010. The trial court dismissed the rape charges with prejudice.

In the aggravated murder case, Gregory sought disclosure of all information relating to RS's work as a police informant. The trial court ordered the TPD to disclose this information. The TPD ultimately produced over 1,000 pages of documents regarding RS's work as an informant from 1992 through 2010. In August 1998 – the month that RS claimed Gregory had raped her – RS worked on at least three cases for the TPD and was paid at least $500.

Gregory filed a pretrial motion to dismiss the death penalty proceeding for the aggravated murder conviction, to order a new guilt phase trial, and to order a *Franks*[2] hearing to discover the extent of the State's knowledge regarding evidence used to support probable cause for the search

---

[2] *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

warrant and blood draw orders. He also claimed that the State had failed to disclose *Brady*[3] information regarding RS and her history as a police informant that would have impacted all probable cause determinations. The trial court denied the motion. The court determined that information regarding RS was either known or was available to Gregory's attorneys before the first trial and the State was not required to disclose the information regarding RS under *Brady*.

Following a second penalty phase trial in June 2012, Gregory again was sentenced to death. The court entered a judgment and sentence confirming the aggravated murder conviction and imposing the death sentence. The judgment and sentence also imposed a number of LFOs, including $10,000 in court-appointed attorney fees and defense costs. Gregory appealed the death sentence.

*Second Appeal – Gregory* II

On appeal, Gregory challenged the constitutionality of the death penalty. *State v. Gregory*, 192 Wn.2d 1, 7, 427 P.3d 621 (2018) ("*Gregory* II"). The Supreme Court held that the death penalty was unconstitutional as administered because it was imposed in an arbitrary and racially biased manner. *Id.* at 5, 18-19. The court relied in part on a study that Gregory commissioned in furtherance of his appeal that resulted in two reports: KATHERINE BECKETT & HEATHER EVANS, THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2012 (Jan. 27, 2014), available at https://perma.cc/XPS27YTR; and KATHERINE BECKETT & HEATHER EVANS, THE ROLE OF RACE IN WASHINGTON STATE CAPITAL SENTENCING, 1981-2014 (Oct. 13, 2014) (Updated Beckett Report), available at https://perma.cc/3THJ-989W. *Gregory* II, 192 Wn.2d at 12-13. The Updated Beckett report concluded that "black defendants are four and one

---

[3] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

half times more likely than similarly situated non-black defendants to be sentenced to death." *Id.* at 12.

The court did not expressly remand for the trial court to correct Gregory's sentence. Instead, the court stated, "All death sentences are hereby converted to life imprisonment." *Id.* at 36.

In his appeal, Gregory also raised arguments regarding his aggravated murder conviction, claiming that "the trial court should have suppressed certain key evidence used at trial (blood samples, DNA, and a knife)." *Gregory* II, 192 Wn.2d at 28. The court noted that Gregory's conviction already had been "appealed, reviewed by this court, and affirmed." *Id.* at 27. Therefore, the court declined to address these arguments. *Id.* at 28-30.

The court also declined to address several constitutional arguments that were rejected in the first appeal, including prosecutorial misconduct during closing argument. *Gregory* II, 192 Wn.2d. at 34-35 & n.16. The prosecutorial misconduct claims were improperly shifting the burden of proof, denigrating defense counsel's cross-examination, commenting on Gregory's right to remain silent, arguing facts not in evidence, and misstating the facts. *Id.* at 34 n.16.

In its conclusion, the court stated, "We decline to reconsider Gregory's arguments pertaining to the guilt phase of his trial. His conviction for aggravated first degree murder has already been appealed and affirmed by this court." *Id.* at 36.

In June 2019, the trial court entered an order converting Gregory's death sentence to life without parole. The court also entered an order vacating the $10,000 in court-appointed attorney fees and defense costs imposed as an LFO in the 2012 judgment and sentence.

Gregory filed this PRP, challenging his conviction.

ANALYSIS

A.     PRP PRINCIPLES

        We will grant appropriate relief when petitioners establish that they are under restraint

that is unlawful for one of certain specified reasons.  RAP 16.4(a)-(c).  However, a PRP is not a

substitute for a direct appeal, and the availability of collateral relief is limited.  *In re Pers.*

*Restraint of Dove*, 196 Wn. App. 148, 153, 381 P.3d 1280 (2016).  " 'Relief by way of a

collateral challenge to a conviction is extraordinary, and the petitioner must meet a high standard

before this court will disturb an otherwise settled judgment.' "  *Id.* (quoting *In re Pers. Restraint*

*of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011)).

        To succeed in a PRP, a petitioner must establish by a preponderance of the evidence (1) a

constitutional error that resulted in actual and substantial prejudice or (2) a fundamental defect of

a nonconstitutional nature that inherently resulted in a complete miscarriage of justice.  *Id.* at

154.

        RAP 16.7(a)(2) requires a petitioner to specifically identify the evidence available to

support the factual allegations in the PRP.  *In re Pers. Restraint of Wolf*, 196 Wn. App. 496, 503,

384 P.3d 591 (2016).  The petitioner must show that he has competent, admissible evidence to

establish facts that would entitle him to relief.  *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18,

296 P.3d 872 (2013).  Conclusory allegations are insufficient.  *Wolf*, 196 Wn. App. at 503.  In

addition, the factual allegations must be based on more than speculation and conjecture.  *Yates*,

177 Wn.2d at 18.

        Under RCW 10.73.090(1), a petitioner generally must file a PRP within one year after a

trial court judgment and sentence becomes final.  A judgment is not final until both the

conviction and sentence are affirmed.  *In re Pers. Restraint of Skylstad*, 160 Wn.2d 944, 946, 162

10

P.3d 413 (2007); *see also State v. Contreras-Rebollar*, 177 Wn.2d 563, 565, 303 P.3d 1062 (2013).

B.       VALIDITY OF SEARCH WARRANT AND BLOOD DRAWS

Gregory argues that the search warrant and the two blood draws were invalid and not supported by probable cause because (1) RS was a "police agent" and therefore her lies that provided the basis for the search warrant affidavit must be imputed to the State, (2) the State failed to disclose RS's work as a police informant and troubled personal background in violation of *Franks*, (3) the officer did not sign the search warrant affidavit under penalty of perjury, and (4) the September 1998 blood draw order was invalid because of procedural deficiencies.  In the alternative, Gregory argues that his defense counsel was ineffective for failing to raise the issues regarding RS's police informant background in the trial court before the murder trial, and (2) the State violated its obligations under *Brady* when it did not disclose RS's police informant background to the defense.

We decline to consider these arguments because the Supreme Court already has ruled on the validity of the search warrant and blood draw orders.

1.    PRP Scope

A PRP may not raise an issue that already has been raised and rejected on direct appeal unless the interests of justice requires reexamining the issue. *Yates*, 177 Wn.2d at 17.  A PRP "should not simply be reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the defendant." *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388-89, 927 P.2d 1250 (1999).

"A 'new' issue is not created merely by supporting a previous ground for relief with different factual allegations or with different legal arguments." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004). In general, " '[a] defendant may not recast the same issue as an ineffective assistance claim; simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previously rejected claim.' " *Id.* (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 720, 16 P.3d 1 (2001).

The interests of justice are served by reconsidering an issue when there has been an intervening change in law or some other justification for failing to raise a particular argument earlier. *Yates*, 177 Wn.2d at 17.

The PRP rule precluding a petitioner from raising issues that have been rejected on direct appeal is consistent with the law of the case doctrine. Under that doctrine, the holding of an appellate court decision on a legal issue must be followed in all of the subsequent stages of the same litigation. *Gregory* II, 192 Wn.2d at 29-30.[4]

2. Rejection of Challenge on Direct Appeal

In *Gregory* I, Gregory challenged the admissibility of the buck knife found in his car pursuant to the search warrant on relevance grounds and because its admission chilled his constitutional right to bear arms. 158 Wn.2d at 835. The court rejected these arguments. *Id.* at 835-36. Gregory did not argue in the first appeal that the search warrant was invalid.

Gregory also challenged the validity of both the September 1998 and the January 2000 blood draws on various grounds. *Id.* at 820-22. The court concluded that the January 2000 blood draw was supported by probable cause and was valid. *Id.* at 823-25. The court declined to

---

[4] RAP 2.5(c)(2) provides a limited exception to the law of the case doctrine when justice would best be served by review of a prior appellate court's opinion. But Gregory does not rely on this rule.

consider the validity of the September 2018 blood draw because the DNA evidence would have been inevitably discovered from that untainted source. *Id.* at 825. Gregory did not argue in the first appeal that RS's lies and the State's failure to disclose RS's police informant history invalidated the blood draws.

In *Gregory* II, Gregory challenged the search warrant and the blood draws based on the State's failure to disclose RS's police informant history. 192 Wn.2d at 28-29. The court characterized his argument as follows:

> Gregory now attempts to reassert many of the same arguments from his first appeal. He claims the State withheld relevant information about R.S. when obtaining the orders to procure a sample of his DNA and a warrant to search his vehicle where the knife was found. Specifically, he asserts that the trial court would not have authorized the warrant or the orders if it was aware that R.S. had a history as a paid confidential informant.

*Id.* The court also noted that Gregory had relied on *Franks* and *Brady* in making this argument in the trial court. *Id.* at 28.

The court "decline[d] to address this argument because reconsideration is barred by law of the case doctrine." *Id.* at 29. The court elaborated:

> The primary justification Gregory asserts for revisiting this issue is the information surrounding R.S.'s history as a confidential informant. However, the trial court found that this information was either known or made available to Gregory's attorney prior to the first trial. Gregory does not challenge this finding on appeal. Thus, Gregory failed to timely raise the issue in the trial court either prior to or during his first appeal. The decision regarding the propriety of the warrant and orders to obtain physical evidence are therefore law of the case and not subject to review. Law of the case also precludes consideration of the *Franks* issue and the probable cause required to obtain the search warrant and blood draw orders. Moreover, Gregory presents no new evidence that would merit authoritatively overruling *Gregory* I.

*Id.* at 30 (citations omitted).

There is no question that the validity of the January 2000 blood draw was resolved in *Gregory* I, 158 Wn.2d at 823-25. The court did not expressly address the validity of the search

warrant. But because the search warrant and the blood draws were based on the same information, the court's analysis finding the blood draw valid applied equally to the search warrant. In addition, the court in *Gregory* II expressly stated that the law of the case precluded consideration of whether probable cause supported the search warrant and blood draws. *Id.* at 30. And the court expressly declined to consider one of the arguments Gregory asserts here – that the State's failure to disclosure RS's police informant history violated *Franks*. *Id.*

Because the Supreme Court rejected Gregory's challenges to the search warrant and blood draws on direct appeal, Gregory is prohibited from raising these challenges again in a subsequent PRP. *Yates*, 177 Wn.2d at 17. The fact that Gregory is now making new arguments cannot revive these issue. *Davis*, 152 Wn.2d at 671. Gregory is *"merely . . . supporting a previous ground for relief with different factual allegations or with different legal arguments."* *Id.* Asserting different arguments cannot avoid the prohibition against asserting an issue in a PRP that previously had been decided on direct appeal. *Yates*, 177 Wn.2d at 17.

Gregory also argues that he received ineffective assistance of counsel when his trial counsel did not challenge the validity of the search warrant before the murder trial on the grounds raised in his PRP. But as noted above, a petitioner cannot recast an argument that previously had been rejected on direct appeal as an ineffective assistance of counsel claim. *Davis*, 152 Wn.2d at 671.

We hold that Gregory is prohibited from challenging in this PRP the validity of the search warrant and the two blood draws because that challenge was raised and rejected in his direct appeals.

C.     USE OF STUN BELT

Gregory argues that his due process rights and right to a fair jury trial were violated when he was forced to wear a stun belt during his murder trial. We disagree.

1.     Due Process

A criminal defendant is entitled to appear at trial free from all restraints except in extraordinary circumstances. *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). As such, "restraining devices should 'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.' " *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418 (2001).

"Although restraints implicate important constitutional rights, the right to be free from restraint is not absolute, and trial court judges are vested with the discretion to determine measures that implicate courtroom security, including whether to restrain a defendant in some capacity in order to prevent injury." *Jackson*, 195 Wn.2d at 852. Trial courts have "broad discretion to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of its occupants. *Damon*, 144 Wn.2d at 691. But there must be a factual basis in the record for the exercise of that discretion. *Jackson*, 195 Wn.2d at 853.

In exercising its discretion whether to allow the defendant to be restrained, the trial court may consider several factors including:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Id.* (alteration in original) (internal quotation marks omitted) (quoting *State v. Hutchison*, 135 Wn.2d 863, 887-88, 959 P.2d 1061 (1998)). Before deciding if a defendant should be restrained, the trial court must conduct a hearing and enter findings that reflect a reasoned analysis that justifies the use of the restraints. *Damon*, 144 Wn.2d at 691-92. Failure to make an adequate inquiry on the record constitutes constitutional error. *State v. Clark*, 143 Wn.2d 731, 775, 24 P.3d 1006 (2001).

A claim of unconstitutional use of a restraint is subject to harmless error analysis. *See Jackson*, 195 Wn.2d at 855. Under that analysis, the State bears the burden to show beyond a reasonable doubt that the use of the restraint was harmless. *Id.* at 856.

2.    Analysis

At two different hearings in 1999 and 2001, the trial court addressed whether the use of restraints on Gregory were necessary during the proceedings of the case. Significant here, the detailed 2001 findings of fact and conclusions of law show that the court considered Gregory's past attempt to escape from jail, the location and security of the courtroom with respect to any potential escape attempts during trial, alternatives to the use of a stun belt, the existence of any *Hartzog* factors, and lack of visibility of a stun belt under Gregory's clothes. The court also balanced Gregory's right to a fair trial and the court's authority to "maintain decorum in the courtroom and to protect the safety of its occupants." *See Damon*, 144 Wn.2d at 691.

After the 2001 hearing, the trial court issued detailed findings of fact and conclusions of law, citing additional events that occurred in between the two hearings that further justified the use of restraints:

> 3.   Based on police reports and information provided by the State, the defendant attempted to escape from the Pierce County Jail on July 31, 2000. The defendant removed the screws from the frame around his window and cracked the window

16

itself. The defendant is charged with Attempted Escape 2 and Malicious Mischief 2 from this incident.

4. In October 2000, the defendant was convicted of three counts of Rape in the First Degree with deadly weapon sentence enhancement. In November, 2000, the defendant was sentenced to 331 months in prison. Regardless of the outcome of this case, the defendant will be taken to the Department of Corrections when this trial is over.

5. The defendant has had several other incidents involving his refusal to comply with the rules of the jail and/or commands from jail staff. Those incidents are listed in the State's memorandum, with specific documentation contained in the appendices of that memorandum. That list of incidents is incorporated herein by this reference.

Clerk's Papers (CP) at 6116-17.

The trial court made additional findings that recognized several *Hartzog* factors and additional factors that it considered:

6. Many of the Hartzog factors are present in this case, including: 1) the defendant is charged with the most serious offense possible; 2) the defendant is only 28 years old, is over six feet tall, and appears to be in good physical condition; 3) the defendant has been convicted of a violent sex offense, three counts; 4) the defendant attempted to escape from the jail; 5) the escape attempt suggests that the defendant might try to escape again; 6) the courtroom in which this case will be tried is the furthest courtroom to respond to in case of an emergency and is quite close to an exit from the building; and 7) there is no adequate alternative remedy; the other options the court has available are belly chain and handcuffs, which would clearly be visible to the jury, or no physical restraints and additional security guards, which would likely cause the jury to speculate why so many officers were present.

7. There are additional factors that the court has considered, including: 1) the defendant has already been sentenced to over 28 years in prison and will be taken to prison regardless of the outcome of this trial, so the incentive to attempt an escape is greater now [than] before the defendant was convicted and sentenced in that case; 2) the stun belt apparatus is not visible to the casual observer because a) it will be covered by the defendant's suit coat and b) the design of the chairs in the courtroom is such that the defendant can sit normally in the chair, completely hiding the stun belt equipment.

8. If the court were to find the stun belt should not be worn, there would have to be additional uniformed jail guards present. This alternative could impact the defendant's right to a fair trial because it might suggest to the jury that the defendant is so dangerous that several officers have to be present to protect persons from him.

CP at 6117-18.

All these findings of fact were supported by a number of attachments to the State's memorandum in support of the use of a stun belt during trial. Based on the findings, the trial court concluded that the stun belt, in comparison to physical restraints or no restraints of any kind but additional security guards, would allow Gregory to appear free of restraints while balancing the safety and security of the courtroom.

Gregory challenges a number of the trial court's findings. First, he argues that he was not a flight risk because there was no real danger of escape when he attempted to pry a window open. But the record shows that Gregory actually removed the screws from the frame around his window and successfully cracked open the window. This was a sufficient basis to find that he was a flight risk, especially in light of the finding that Gregory had been sentenced to over 28 years in prison for the then-valid rape conviction and would be taken to prison regardless of the outcome of the aggravated murder trial.

Second, Gregory argues that consideration of his rape conviction was not valid because that conviction later was reversed. But the trial court could not have known that the rape conviction would be reversed five years after it ordered the use of the stun belt.

Third, Gregory argues that the trial court's findings regarding his size, age, and physical shape may have been based on explicit or implicit racial bias. But he fails to provide any support for such an allegation. And age and physical attributes clearly are permissible factors to consider when determining if a defendant needs to be restrained. *Jackson*, 195 Wn.2d at 853.

Fourth, Gregory disputes the trial court's finding that the stun belt apparatus would not be visible to the jury based on the fact that it was covered by his clothes and the design of the chairs in the courtroom. He cites to defense counsel's comment on the record that eight potential jurors

in the gallery section could see where Gregory was seated and the bulge in his back. However, the State clarified that the corrections officer confirmed that the stun device was not visible from the gallery because it was below the back of the chair where Gregory was sitting that morning. And defense counsel did not object after the trial court stated on the first day of trial that the stun belt was not visible to the jury while Gregory was seated.

Even if there was a factual dispute, the trial court was in a unique position to determine the visibility of the stun belt apparatus in its own courtroom. Further, the court stated that it would continue to monitor the use of the stun belt during the course of the trial to ensure that it remained hidden from the jury.

Finally, Gregory argues that the psychological effects of the stun belt further compounded the alleged racial bias in the jury because it caused him to appear stiff and emotionless. But he fails to point to any evidence in the record to support this allegation and the declaration that Gregory provides from his trial counsel only makes conclusory statements that the jurors may have speculated that Gregory was restrained during trial and made him look emotionless.

The trial court fully analyzed on the record whether to allow a stun belt to be applied to Gregory as required and considered many of the factors identified in *Jackson*. We conclude that substantial evidence in the record supports the trial court's findings of fact and conclusions of law. Further, we conclude that the trial court did not abuse its discretion in allowing a stun belt to be applied to Gregory during his trial. As a result, we hold that use of the stun belt did not violate Gregory's constitutional rights.[5]

---

[5] Gregory argues that this case should be sent to the trial court for a reference hearing to determine whether the jury could have seen the stun belt and to determine any other effects of using the stun belt. Based on our holding, there is no basis for a reference hearing on this issue.

D.       RACIAL BIAS OF JURY

Gregory argues that his conviction must be vacated because it rests upon a verdict from a jury that was infected by racial bias in violation of the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 21 and 22 of the Washington Constitution.  He argues that the Supreme Court in *Gregory* II already determined that the jury in his case likely was infected by explicit or implicit racial bias.  We disagree.

1.    Legal Principles

Under the Sixth and Fourteenth Amendments of the United States Constitution, a criminal defendant has the right to be tried by a jury that is "representative of the community." *State v. Barajas*, 143 Wn. App. 24, 34, 177 P.3d 106 (2007).  However, there is "no constitutional right to a jury comprised in whole, or in part, of persons of his or her own race." *Id.*  But there is a constitutional right to " 'be tried by a jury whose members are selected pursuant to non-discriminatory criteria.' "  *Id.* (quoting *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)).

The Supreme Court in *State v. Behre* expressed concern regarding racial bias within juries:

> Unlike isolated incidents of juror misbehavior, racial bias is a common and pervasive evil that causes systemic harm to the administration of justice.  Also unlike other types of juror misconduct, racial bias is uniquely difficult to identify.  Due to social pressures, many who consciously hold racially biased views are unlikely to admit to doing so.  Meanwhile, implicit racial bias exists at the unconscious level, where it can influence our decisions without our awareness.
> . . . .
>
> An "impartial jury" means "an unbiased and unprejudiced jury," and allowing bias or prejudice by even one juror to be a factor in the verdict violates a defendant's constitutional rights and undermines the public's faith in the fairness of our judicial system.

193 Wn.2d 647, 657-58, 444 P.3d 1172 (2019) (quoting *Alexson v. Pierce County*, 186 Wash. 188, 193, 57 P.2d 318 (1936)).

    2.    Analysis

Gregory acknowledges that he does not provide any evidence to support his allegations that his jury evidenced explicit or implicit racial bias when he was convicted of aggravated murder. Nor does he make a *Batson* challenge arguing that the jury was selected in a discriminatory manner. Instead, he asks this court to apply the holding in *Gregory* II regarding racial bias in capital murder juries to this case. He claims that "there is now a definitive determination from the Washington Supreme Court that capital juries in Washington State from 1981 until 2014 were plagued by racial bias." Br. of Pet'r at 34.

However, the Beckett reports referenced in *Gregory* II provided data and analysis regarding how race influences the *imposition of the death penalty*, not how race impacts a jury's deliberation on whether a Black defendant is guilty of aggravated murder. *See Gregory* II, 192 Wn.2d at 12. And the Supreme Court in *Gregory* II did not make the determination that capital murder juries in general or this specific jury was infected with racial bias. Instead, the court's holding was limited to an assessment of the "association between race and the death penalty" and to "[t]he arbitrary and race based imposition of the death penalty." *Gregory* II, 192 Wn.2d at 22-23. In the absence of the type of data compiled regarding the imposition of the death penalty, we cannot agree with Gregory's suggestion that a jury that was racially biased in assessing the death penalty necessarily would be racially biased in convicting a defendant. We conclude that the Supreme Court's holding in *Gregory* II does not support a finding that the jurors were affected by racial bias during the conviction phase of the trial.

Gregory notes the fact that he was convicted by an all-white jury selected from a jury pool that included only two Black potential jurors, even though Pierce County's population at the time was eight percent Black. One of the Black prospective jurors was excused because of hardship and the other was stricken for cause because of opposition to the death penalty. But he acknowledges that these facts are not sufficient to grant him relief. *See Yates*, 177 Wn.2d at 20-21 (rejecting a claim that the jury pool was not from a fair cross section of the community without statistical evidence that certain groups have been underrepresented in jury pools).

Gregory also notes the use of antiquated racial terms like "Negroid" and "Negro" during expert testimony regarding DNA evidence. But he acknowledges that use of such words is not necessarily proof of improper racial bias. *See In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 634, 316 P.3d 1020 (2014) (stating that "[t]he prosecution's use of the word [Negroid] does not in any way appear to be an appeal to race-based prejudices, and we reject the claim that it was improper").

Gregory cites *Berhe* to highlight the prevalence of racial bias in juries. In that case, a juror informed defense counsel and the trial court after conviction that she wanted to vote "not guilty" but that the other jurors ignored her concerns because she was the only juror who was the same race as the defendant. *Berhe*, 193 Wn.2d at 651, 54. The defendant moved for a new trial and requested an evidentiary hearing based on this information. *Id.* at 653. The Supreme Court held that the trial court failed to conduct a sufficient inquiry into the allegations of racial bias that influenced the jury verdict and vacated the trial court's order denying the defendant's motion for a new trial. *Id.* at 669-70. But *Berhe* is inapplicable here because Gregory concedes that there is no evidence that any juror exhibited implicit or explicit racial bias in this case.

Gregory has presented no actual evidence that the jury was infected by racial bias when it convicted him of first degree aggravated murder. Therefore, we reject Gregory's racial bias claim.

E.     PROSECUTORIAL MISCONDUCT

Gregory argues that the State's "declare the truth" arguments during opening statement and closing arguments constituted prosecutorial misconduct. We agree that the arguments were improper, but we conclude that Gregory waived this claim when he did not object at trial.

1.     Standard of Review

To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the record and all of the circumstances of the trial. *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020).

A prosecutor's " 'opening statement should be confined to a brief statement of the issues of the case, an outline of the anticipated material evidence, and reasonable inferences to be drawn therefrom.' " *Loughbom*, 196 Wn.2d at 76 (quoting *State v. Campbell*, 103 Wn.2d 1, 15-16, 691 P.2d 929 (1984)). In addition, prosecutors have wide latitude during closing argument to argue reasonable inferences from the evidence, but such arguments must be based on probative evidence and sound reason. *Id.* at 76-77.

To establish prejudice, the defendant must show a substantial likelihood that the misconduct affected the jury verdict. *State v. Thorgerson*, 172 Wn.2d 438, 442-43, 258 P.3d 43 (2011). When analyzing prejudice, we do not look at the alleged improper remarks "in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury." *State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

When the defendant fails to object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). In order to prevail under this heightened standard, the defendant must show that (1) no curative instruction could have eliminated the prejudicial effect, and (2) there was a substantial likelihood the misconduct resulted in prejudice that affected the verdict. *Id.* at 761.

    2.    Reviewability of Claim

Initially, the State argues that the law of the case doctrine applies here because the Supreme Court in *Gregory* I found no prosecutorial misconduct based on the State's closing argument that allegedly shifted the burden of proof to the defense. The State also notes that the Supreme Court in *Gregory* II declined to address Gregory's multiple prosecutorial misconduct challenges.

As noted above, a petitioner generally may not raise a claim that already has been raised and rejected on direct appeal. *Yates*, 177 Wn.2d at 17. However, although Gregory raised several prosecutorial misconduct claims in his first two appeals, he did not challenge the prosecutor's "declare the truth" remarks in those appeals. *See Gregory* II, 192 Wn.2d at 34-35 & n.16; *Gregory* I, 158 Wn.2d at 841-46. Making a prosecutorial misconduct claim based on one ground does not preclude a subsequent PRP asserting prosecutorial misconduct based on another ground. *See In re Pers. Restraint of Khan*, 184 Wn.2d 679, 688-89, 363 P.3d 577 (2015) (addressing a new ineffective assistance of counsel in a PRP based on a different ground of ineffective assistance of counsel that was raised in the direct appeal). Therefore, we consider Gregory's new allegation of prosecutorial misconduct.

3. "Declare the Truth" Arguments

a. Challenged Statements

Here, one of the prosecutors stated in her opening statement:

> We ask a lot of juries in this system. We ask a lot of juries. What we ask you for is to listen to the evidence and to render a verdict. And the word "verdict" that we use in American courts comes from Latin, veredictum, and it means declare the truth, declare the truth.

> You listen to the evidence in this case and declare the truth. It's the defendant, Allen Gregory, who decided to rob [GH], who decided to rape her, and he decided to murder her. Declare the truth, ladies and gentlemen. Convict the defendant.

RP (Feb. 14, 2001) at 4076. Gregory did not object.

A different prosecutor continued with the "declare the truth" theme in his closing argument:

> In opening statement, Ms. Robnett told you that the only purpose that you have as jurors in a criminal case is to declare the truth, and it's with that purpose in mind that closing arguments proceed. Closing argument is the time when you take the evidence that you were presented on the witness stand and fit it into the instructions that the court just read to you. The purpose of closing argument is to point you toward a just verdict, declaring the truth, doing justice, two ways of saying the same thing. That's the only thing that the state is interested in in this case.

RP (Mar. 19, 2001) at 6700. He again repeated "declare the truth" comments in rebuttal.

Gregory did not object to either argument.

b. Improper Argument

This court was the first appellate court in Washington to hold that "declare the truth" arguments were improper in *State v. Anderson*, 153 Wn. App. 417, 429, 220 P.3d 1273 (2009). The court stated, "A jury's job is not to 'solve' a case. It is not, as the State claims, to 'declare what happened on the day in question . . . . Rather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt." *Id.*

Another panel of this court subsequently held that a "speak the truth" argument was not misconduct. *State v. Curtiss*, 161 Wn. App. 673, 701-02, 250 P.3d 496 (2011). But in a later case this court again relied on *Anderson* in determining that such an argument was improper. *State v. Walker*, 164 Wn. App. 724, 733, 265 P.3d 191 (2011).

The Supreme Court subsequently confirmed that when the prosecutor tells the jury to "declare the truth," it is a misstatement of the burden of proof and constitutes improper conduct. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014); *Emery*, 174 Wn.2d at 760. The court in *Emery* stated, "The jury's job is not to determine the truth of what happened; a jury therefore does not 'speak the truth' or 'declare the truth.' " 174 Wn.2d at 760. Instead, "a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *Id.*

Here, the State used nearly identical language that the Supreme Court twice has held was improper. *See Lindsay*, 180 Wn.2d at 430, 437; *Emery*, 174 Wn.2d at 751, 760. Therefore, we conclude that the prosecutor's statements were improper.

c.    Failure to Object

Because Gregory failed to object to the prosecutors' statements, the question here is whether he waived his challenge. *See Emery*, 174 Wn.2d at 760-61.

First, the prosecutors' statements were not necessarily flagrant and ill-intentioned. They certainly would be if made today. But *Anderson*, the first case holding that "declare the truth" arguments were improper, was decided over eight years after Gregory's murder trial. 153 Wn. App. 417. And even after *Anderson* this court issued contrary opinions on this issue. *Walker*, 161 Wn. App. at 733; *Curtiss*, 161 Wn. App. at 701-02. *Emery* was decided 11 years after

Gregory's trial. 174 Wn.2d 741. Therefore, this was not a situation where the prosecutor was ignoring established precedent.

Second, the prosecutors' statements could have been cured by an instruction if Gregory had objected. The court in *Emery* held that an instruction could have cured a "declare the truth" argument and another argument misstating the State's burden of proof. 174 Wn.2d at 763-64. The court noted that these types of comments were not so inflammatory that they created incurable prejudice. *Id.* at 762-63. The court stated that the trial court "could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden. Such an instruction would have eliminated any possible confusion and cured any potential prejudice stemming from the prosecutor's improper remarks." *Id.* at 764.

Accordingly, we hold that although the "declare the truth" statements were improper, Gregory waived his challenge to those statements.

4. Ineffective Assistance of Appellate Counsel

Gregory also argues in the alternative that it was ineffective assistance of appellate counsel not to challenge the State's use of the "declare the truth" arguments in his first appeal. He submits a declaration from his appellate counsel that the failure to raise this challenge was not based on any tactical reason.

To establish ineffective assistance of appellate counsel, a petitioner bears the burden to show that (1) his appellate counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *In re Pers. Restraint of Salinas*, 189 Wn.2d 747, 759, 408 P.3d 344 (2018). The petitioner also must show that the legal issue that the appellate counsel did not raise had merit and that he or she actually was prejudiced. *Id.* at 760.

27

Here, we hold above that Gregory waived his challenge to the "declare the truth" statements by not objecting at trial. Gregory cannot show that the result would have been any different if the issue had been raised in the first appeal. Therefore, we hold that Gregory cannot establish ineffective assistance of appellate counsel on this ground.

F.    CUMULATIVE ERROR

Gregory argues that cumulative error requires this court to vacate his aggravated murder conviction. Under the cumulative error doctrine, the defendant bears the burden to show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017).

Here, Gregory has not demonstrated that regardless of any errors, he was denied a fair trial. Therefore, we hold that the cumulative error doctrine is inapplicable.

G.    INTEREST ON VACATED LFO

Gregory argues, and the State conceded at oral argument, that there is no authority to assess interest on court-appointed attorney fees that originally were imposed as an LFO in the 2012 judgment and sentence but subsequently vacated in 2019. We accept the State's concession, and we hold that any interest that accrued on the vacated imposition of court-appointed attorney fees as an LFO must be removed.

CONCLUSION

We deny Gregory's PRP regarding his conviction, but we remand for the trial court to remove the interest on the vacated LFO.

28

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

CRUSER, J.

VELJACIC, J.