# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58921-4-II |
| Respondent, | |
| v. | |
| GUILLERMO RAYA LEON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—In the summer of 2021, Guillermo Raya Leon; his brother, Abran; and Abran's wife, Misty,[1] were involved in a gun trafficking scheme involving numerous stolen firearms and a significant amount of stolen ammunition. Law enforcement officers tracked the trio to southwestern Washington. Throughout the day, the Raya Leons engaged in countersurveillance and evasive maneuvers to avoid law enforcement officers, at one point driving 100 m.p.h. on a highway and weaving in and out of traffic.

Later that afternoon, detectives spotted the Raya Leons at an apartment complex where they saw the Raya Leons unloading multiple bags of what appeared to be firearms out of their vehicle and into an apartment. While in the apartment, Raya Leon correctly identified Detective Jeremy Brown as an undercover officer surveilling them from an unmarked Jeep. Raya Leon armed himself with a revolver, which he hid in the kangaroo pocket of his hooded sweatshirt, and approached Detective Brown's Jeep from behind. Raya Leon shot Detective Brown once before

---

[1] We refer to Abran and Misty by their first names for clarity because they share a surname with Guillermo Raya Leon.

fleeing. Detective Brown fired multiple shots at Raya Leon before succumbing to his injuries at the scene. None of Detective Brown's shots hit Raya Leon.

Raya Leon, Abran, and Misty fled the apartment. After crashing their vehicle, the three of them attempted to run from pursuing officers. Raya Leon broke into a home and stole a vehicle, which he used to flee to Oregon. Eventually, Raya Leon was arrested.

Following a jury trial, Raya Leon was convicted of one count of aggravated first degree murder of Detective Brown, two counts of possession of a stolen firearm, one count of first degree trafficking in stolen property, first degree burglary, and theft of a motor vehicle, and four firearm sentencing enhancements. Raya Leon appeals two of his convictions, arguing that the trial court erred by giving a first aggressor instruction and that insufficient evidence supported his convictions for aggravated first degree murder and first degree burglary.

We disagree and affirm.

FACTS

I. BACKGROUND

A.      Investigation and Pursuit

In the summer of 2021, the Clark County Sheriff's Office Tactical Detective Unit, an undercover, plainclothes unit, began investigating Raya Leon, Abran, and Misty in connection to the burglary of a storage unit, where they stole 30 firearms and 30,000 to 50,000 rounds of ammunition. Law enforcement obtained a written trace order for Misty's phone so they could locate Misty and arrest her. Members of a tactical detective unit received pings from Misty's phone providing location information for the phone. The information showed that Misty was located in the Castle Rock area.

2

Following the pings, law enforcement discovered a car associated with Misty at a hotel in Castle Rock. Raya Leon, Misty, and Abran were all seen at the hotel. The trio left the hotel in their car, and law enforcement attempted to follow them in undercover vehicles. After it became clear that the Raya Leons were trying to avoid surveillance and had likely spotted at least one of the undercover vehicles, one of the detectives involved contacted local law enforcement for assistance with a traffic stop.

When local officers attempted a traffic stop by turning on their lights and sirens, the Raya Leons fled, driving recklessly away from the police vehicles at over 100 m.p.h., zigzagging in and out of traffic and darting across lanes. At one point, the Raya Leons' vehicle veered into the median and nearly lost control before veering back across all three lanes of the freeway, narrowly avoiding other drivers who had to use evasive maneuvers to avoid collision.

After the failed traffic stop, detectives continued to track Misty's phone and followed the suspects to a shopping center where they switched to a different car. Lani Kraabell, Misty's friend, was driving the second car. At that time, the detectives asked for help from the Vancouver and Clark County law enforcement, in plainclothes and unmarked vehicles, to assist with surveillance. Attempts to follow the Raya Leons once they left the shopping center failed, but detectives were able to search the license plate of the second vehicle and discovered that it was associated with an address at an apartment complex in Vancouver, where Kraabell had been staying.

B.      Shooting

Kraabell drove the Raya Leons to the apartment. On the way there, Misty asked Kraabell if she knew anyone who would be interested in buying the firearms. The entire drive to the apartment, Raya Leon insisted they were being followed by police.

Detectives found the car Kraabell was driving at the apartment complex and set up surveillance while they made a plan to obtain and execute a search warrant. Detectives saw the Raya Leons moving items that appeared to be the stolen firearms into the apartment. Raya Leon was photographed wearing a T-shirt and shorts.

The detectives believed executing the warrant themselves posed a significant safety risk given the firearms and ammunition involved and the historical information they knew about the suspects. They continued surveillance while waiting for a SWAT team to arrive to execute the warrant on the apartment. Detective Brown, an undercover Clark County detective, parked his unmarked red model Jeep inside the apartment complex across from the back of the apartment where he could watch the Raya Leons.

Inside the apartment, Raya Leon insisted that they were being watched by law enforcement. He told Kraabell, Abran, and Misty that there was someone in a car with a computer watching the apartment. Raya Leon was clear that he believed the person was a police officer. Eventually, Misty handed Raya Leon a gun and told him to "go check it out," "no loose ends." 6 Verbatim Rep. of Proc. (VRP) at 2819, 2894. Raya Leon left the apartment with the gun and wearing a hooded sweatshirt, despite it being a warm summer day. Three minutes later, Misty shouted at Abran that they needed to leave and the two of them ran out the door.

David Wilson, who lived in the same apartment complex, heard one gunshot, a pause, and then four to five additional gunshots in rapid succession. When Wilson looked out of his bedroom window to see what was going on, he saw Detective Brown struggling through the window of his Jeep. When Wilson approached the Jeep, he found Detective Brown deceased. Another resident of the apartment complex also reported hearing one gunshot followed by several gunshots.

An autopsy later determined that a bullet entered Detective Brown's left arm and traveled through the left side of his chest to the right side. The bullet went through Detective Brown's left lung, through his heart, and into his right lung, killing him. [2]

C.      Flight

The other law enforcement officers were not immediately aware that Detective Brown had been shot and attempted to follow the Raya Leons as they fled the scene. Another high-speed chase ensued until Abran crashed the car into a tree. The Raya Leons then fled by foot through people's yards. Law enforcement used a K-9 tracking unit, and a SWAT team responded to search for the trio. A few hours after beginning their search, the police dog led officers to a backyard where they discovered Abran and Misty hiding in a bush.

At the house where Abran and Misty had been hiding, officers noticed that the back sliding door to the home was open but no one was home. They obtained a search warrant for the home, and during the search, the gun used to kill Detective Brown was recovered in a flowerpot outside the house. A car had been stolen from the driveway of the home using keys that had been left in the house. Two days later, U.S. Marshals located Raya Leon in the same stolen car in Oregon and arrested him. Inside the car was Raya Leon's black fanny pack, which contained a Glock firearm.

D.      Police Interview

After he was arrested, Raya Leon waived his *Miranda*[3] rights and agreed to speak with detectives. In his interview, Raya Leon recalled originally noticing that they were being followed

---

[2] Although Raya Leon presented testimony from an expert trauma surgeon at trial opining that Detective Brown would not have been able to move purposefully to fire seven shots after being shot himself through the lungs and heart, Raya Leon does not rely on this testimony to support any of his arguments on appeal.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1996).

by an undercover vehicle: "I let my brother know and his wife. And they thought I was just [f**king] tripping. And I told them I wasn't. I know when somebody's . . . I'm being followed and [sh**], you know? You know when you get that gut feeling? Yeah." Ex. 3 (Interview Tr.) at 992.

Raya Leon said he noticed Detective Brown's red Jeep at the apartment complex. When Misty told Raya Leon she saw Detective Brown looking towards them with binoculars, Raya Leon felt his suspicions were confirmed: "And then I was like man, I was like, I already knew, I was like, from there. 'Cause I already had a gut feeling that it's [f**king], you know, we were already just being followed." Ex. 3 (Interview Tr.) at 1015. At points during the interview, Raya Leon says he was not certain Detective Brown was a police officer, stating, "I didn't know exactly who he was . . . a cop or somebody working for . . . or like . . . a detective or . . . something like that." Ex. 3 (Interview Tr.) at 1027.

Raya Leon explained that when he first left the apartment to approach the Jeep, he started to go left but decided to change direction and go around the back so the man in the Jeep would not see him. Raya Leon had one hand in the pocket of his hooded sweatshirt where his gun was located. He noticed that the man in the Jeep had a laptop, which confirmed his belief that Detective Brown was a law enforcement officer.

Raya Leon recalled approaching the red Jeep and interacting with Detective Brown:

I walked up behind the Jeep, I walked up to the window and I . . . said, "Hey, like are you looking for something or are you waiting for something?" And that's . . . you could tell he kind of got . . . just I don't know if he was scared or something, he wasn't expecting me to come through . . . the back woods, you know? He had a laptop on his lap. And he barely even cracked his back window a little bit to talk to me. I was like so I think that was kind of weird. And then he started talking like more like he's just like, "Back up." And then like got aggressive towards me and then I seen him . . . like reaching for his gun. And then so I . . . slowly walked back and then . . . I kept walking back to the back of the Jeep and I don't even remember who shot first. I . . . wasn't even looking where. I didn't think I even hit him, you

know, or anything. And then I . . . ran and I heard like six shots, he's still after me. He just . . . he just unloaded the whole clip and I just kept running and running and running. And I didn't get hit. And that's what happened. I never meant to kill anybody.

Ex. 3 (Interview Tr.) at 1000-01. He explained that when Detective Brown told him to back up, Raya Leon started to back up and believed that Detective Brown was about to start shooting at him. Raya Leon also admitted that as he ran away from the shooting, he understood that he had just shot or shot at a police officer.

Raya Leon repeatedly said that he could not remember if he or Detective Brown shot first. He admitted that he had been arrested before, and he had experienced police officers pointing their guns at him, but in those instances they did not shoot. Later in the interview, Raya Leon stated that he never saw Detective Brown's gun pointed all the way at him but that the detective had drawn his gun.

During his flight from the gunfight, Raya Leon said he crawled through a window of a home, found car keys, and took the car that was parked at the home. He stated that he had a Glock with him at this time, but he was not sure where the revolver from the gunfight was.

## II. PROCEDURE

The State charged Raya Leon with one count of aggravated first degree murder, two counts of possession of a stolen firearm, one count of first degree trafficking in stolen property, first degree burglary, and theft of a motor vehicle, with four firearm sentencing enhancements.

Following a CrR 3.5 hearing, the trial court ruled that the recording of Raya Leon's interview with detectives was admissible at trial, and the trial court later admitted the transcript of the interview as an exhibit.

7

At trial, the State argued, in relevant part, that Raya Leon had snuck up on Detective Brown with the premeditated intent to kill him in order to avoid apprehension by law enforcement. Raya Leon argued that the State could not prove that he had the premeditated intent to kill Detective Brown. He claimed that the evidence instead supported a conclusion that Raya Leon shot Detective Brown in self-defense as a reaction to Detective Brown pulling his weapon.

Witnesses testified to the facts as described above. In addition, a police investigator for the State testified that revolvers like the one Raya Leon used to shoot Detective Brown are increasingly popular with criminals because they do not leave shell casings at the scene when fired.

Raya Leon presented testimony from a firearms expert who reviewed the discovery in the case. From the evidence he reviewed, he concluded that Detective Brown "reacted very quickly to a perceived threat and did not have much time to do anything else." 9 VRP at 4061. In his opinion, Raya Leon's appearance at the Jeep would have been perceived as a threat even if Raya Leon did not have his gun drawn, given what Detective Brown knew about the gun trafficking operation. The expert testified that he believed Detective Brown fired appropriately.

The trial court instructed the jury on first degree murder, second degree murder, first degree manslaughter, and second degree manslaughter. At the State's request, and over Raya Leon's objection, the trial court gave a first aggressor instruction, which provided that "[n]o person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person." Clerk's Papers (CP) at 951. The instruction also explained that if the defendant was the first aggressor, self-defense was not available to him as a defense.

The trial court also issued two sets of self-defense instructions—one applying if the jury found that Raya Leon did not know that Detective Brown was a law enforcement officer and one applying if it found that he did know. If the jury found that Raya Leon knew Detective Brown was a law enforcement officer, it could only then find that Raya Leon acted in self-defense if Detective Brown used excessive force placing Raya Leon in actual and imminent danger of death or great personal injury.

In closing arguments, Raya Leon conceded he was involved in firearms trafficking, he illegally possessed two guns, and he stole a car. In addition, he did not argue that he did not shoot Detective Brown. Instead, he asked the jury to return a verdict of a lesser included offense to aggravated first degree murder, specifically, first degree manslaughter. He also asked the jury to find that there was insufficient evidence to prove he possessed a gun when he unlawfully entered the home when he was fleeing, reducing the first degree burglary to a lesser offense of residential burglary.

The jury found Raya Leon guilty of premeditated first degree murder, two counts of possession of a stolen firearm, first degree trafficking in stolen property, first degree burglary, and theft of a motor vehicle. The jury also found that the State had proven beyond a reasonable doubt that Raya Leon committed first degree murder while armed with a firearm and against a law enforcement officer who was performing his official duties at the time. The jury also found that Raya Leon knew the victim was a law enforcement officer, elevating the murder conviction to aggravated first degree murder. The jury also found that the State had proven beyond a reasonable doubt that Raya Leon committed first degree trafficking in stolen property, first degree burglary, and theft of a motor vehicle, each while armed with a firearm.

9

Raya Leon was sentenced to life in prison without the possibility of parole.

Raya Leon appeals. Additional relevant facts appear in the analysis below.

ANALYSIS

I. FIRST AGGRESSOR INSTRUCTION

Raya Leon argues that the trial court erred by giving the jury a first aggressor instruction because it was not supported by sufficient evidence that he was the first aggressor. We disagree.

We review de novo a trial court's decision to give a first aggressor jury instruction. *State v. Kee*, 6 Wn. App. 2d 874, 878, 431 P.3d 1080 (2018). "Jury instructions are sufficient if they are supported by substantial evidence, allow the parties to argue their theories of the case, and when read as a whole properly inform the jury of the applicable law." *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). Jury instructions are reviewed on "a case-by-case inquiry." *State v. Grott*, 195 Wn.2d 256, 271, 458 P.3d 750 (2020). In making this determination, we view the evidence in the light most favorable to the party who proposed the instruction, here the State. *Id*. at 270.

A defendant's use of force is lawful and self-defense can be asserted as a defense if the defendant subjectively and reasonably believes that the victim will inflict imminent harm. *Id*. at 266. However, self-defense cannot be invoked if the defendant was the first aggressor. *Id*. "[T]he reason one generally cannot claim self-defense when one is an aggressor is because 'the aggressor's victim, defending himself against the aggressor, is using lawful, not unlawful, force; and the force defended against must be unlawful force, for self-defense.'" *State v. Riley*, 137 Wn.2d 904, 911, 976 P.2d 624 (1999) (footnotes omitted) (quoting 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.7(e) at 657-58 (1986)). Therefore, a first aggressor jury instruction should be given if the evidence supports the instruction. *Id*.

The first aggressor instruction given to the jury in this case provided that "[n]o person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self-defense and thereupon kill another person." CP at 951. The instruction further explained, "if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the fight, then self-defense is not available as a defense." And "[w]ords alone are not adequate provocation for the defendant to be the aggressor." *Id.*

There is sufficient evidence to support a first aggressor instruction where the jury could determine through credible evidence that the defendant provoked the need to act in self-defense. *Grott*, 195 Wn.2d at 273. The instruction is appropriate where there is conflicting evidence as to whether the defendant's conduct precipitated a fight. *Riley*, 137 Wn.2d at 910. Although the provoking act generally cannot be the assault with which the defendant is charged, this rule does not apply "where the defendant engaged in a course of aggressive conduct, rather than a single aggressive act." *Grott*, 195 Wn.2d at 271.

In *State v. Zeigler*, 30 Wn. App. 2d 780, 795, 546 P.3d 534 (2024), this court held that sufficient evidence supported giving a first aggressor instruction where the defendant approached his victim in a car with his hand in his pocket where he held a gun. The court inferred that the victim believed Zeigler was holding a gun and noted that "[t]his would explain the fact that [the victim] was shaking and looked scared as Zeigler was yelling at him." *Id*. at 794. The court considered this fact in combination with Zeigler's conduct of standing over the victim as he yelled that he was a "'real gangster'" and that the victim was "'disrespecting him.'" *Id*. (quoting record). The court concluded that these facts considered together and taken in the light most favorable to

11

the State established sufficient evidence that Zeigler's aggressive conduct reasonably placed the victim in fear of imminent harm and supported giving the first aggressor instruction. *Id*. at 795.

Here, although Raya Leon did not yell at or stand over Detective Brown as the defendant in *Ziegler* did, he similarly took steps before shooting at the detective that the jury could infer were threatening enough to provoke a violent response from Detective Brown, considering all of the circumstances. Raya Leon spent the day leading up to the shooting taking sometimes extreme and dangerous measures to avoid apprehension by law enforcement, which Detective Brown knew. Raya Leon was involved in a significant gun trafficking scheme, and Raya Leon admitted in his interview that the detective would have known the suspects were armed. The law enforcement officers tasked with surveilling Raya Leon were cognizant of the significant safety risk Raya Leon posed and purposefully waited to engage with them until SWAT arrived.

Raya Leon admitted to taking a circuitous route to sneak-up on Detective Brown so he could approach the detective from behind. Despite it being a warm July day and having worn a T-shirt and shorts all day prior, Raya Leon put on a hooded sweatshirt with a kangaroo pouch to hold his gun before leaving the apartment. Raya Leon had his hand inside the pocket with the gun as he approached Detective Brown. It is therefore reasonable that Raya Leon's sudden appearance at Detective Brown's vehicle provoked Detective Brown to draw his firearm, which could have resulted in Raya Leon believing he needed to act in self-defense. Certainly, showing up unexpectedly or surprising the victim, by itself, would not be enough to support a first aggressor instruction, but in conjunction with all of the other facts, Raya Leon's stealthy approach was a factor that supported giving the instruction in this case.

Raya Leon argues that because he fired only a single shot, and that shot was the basis for the charged murder, the first aggressor instruction was improper. Although the provoking act generally cannot be the assault with which the defendant is charged, the Supreme Court has held that this rule does not apply where there has been a course of aggressive conduct. *Grott*, 195 Wn.2d at 271. Here, there were other actions that would have reasonably provoked the detective's reaction: Raya Leon took pains to approach the detective from behind, wearing an unseasonable hooded sweatshirt with his hand in his pocket, after taking extreme measures to avoid capture all day, and understanding officers would have known he was likely to be armed. Thus, the jury did not need to rely solely on the shot that killed Detective Brown when determining whether Raya Leon was the first aggressor.

Because we take the evidence in the light most favorable to the State, and an instruction is appropriate where there is conflicting evidence as to whether the defendant's conduct precipitated a fight, we hold that under the unique facts of this case, the trial court did not err by issuing the first aggressor instruction. *Grott*, 195 Wn.2d at 271; *Riley*, 137 Wn.2d at 910.

## II. SUFFICIENCY OF THE EVIDENCE

Raya Leon argues that insufficient evidence supported his convictions for aggravated first degree murder and first degree burglary. We disagree.

"Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). A defendant challenging the sufficiency of the evidence "admits the truth of all of the State's evidence." *Id*. We draw all "reasonable inferences in the State's favor." *Id*. at 266.

"We consider both circumstantial and direct evidence as equally reliable and defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence." *State v. Hernandez*, 172 Wn. App. 537, 543, 290 P.3d 1052 (2012). Credibility determinations are made by the trier of fact and are not subject to review. *Cardenas-Flores*, 189 Wn.2d at 266. We will not reweigh the evidence or substitute our judgment for that of the fact finder. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

A.     Aggravated First Degree Murder

Raya Leon challenges his conviction for aggravated first degree murder on three bases: that the State failed to prove beyond a reasonable doubt that he (1) had a premeditated intent to kill Detective Brown, (2) knew Detective Brown was a law enforcement officer, and (3) did not act in self-defense. We disagree.

A person is guilty of murder in the first degree when with a premeditated intent to cause the death of another person, he causes the death of such person. RCW 9A.32.030(1)(a). A person is guilty of aggravated first degree murder, as relevant here, if he commits first degree murder and the victim was a law enforcement officer who was performing their official duties at the time of the act resulting in death, and the defendant knew or reasonably should have known the victim was a law enforcement officer performing official duties at the time of the killing. Former RCW 10.95.020(1) (2020).

1.     Premeditated intent to kill

Raya Leon argues that the State failed to prove beyond a reasonable doubt that he had the premeditated intent to kill Detective Brown. We disagree.

14

Premeditation is the distinguishing element between first degree and second degree murder. Premeditation requires "more than a moment in point of time." RCW 9A.32.020(1). The State must show "'the deliberate formation of and reflection upon the intent to take a human life'" with "'thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" *State v. Hummel*, 196 Wn. App. 329, 354, 383 P.3d 592 (2016) (quoting *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)). "The 'mere opportunity to deliberate is not sufficient to support a finding of premeditation.'" *Id*. (quoting *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995)).

Factors that are particularly relevant when establishing premeditation are method, procurement of a weapon, stealth, and motive. *State v. DeJesus*, 7 Wn. App. 2d 849, 883, 436 P.3d 834. A "wide range" of other factors can also be relevant and can "support an inference of premeditation." *State v. Aguila*r, 176 Wn. App. 264, 273, 308 P.3d 778 (2013) (citing *State v. Finch*, 137 Wn.2d 792, 831, 975 P.2d 967 (1999)). Thus, we consider the totality of the circumstances. *See State v. Ollens*, 107 Wn.2d 848, 855, 733 P.2d 984 (1987) (Callow, J., concurring in result) (describing the jury's evaluation of whether a killing was premeditated as "the evaluation of the totality of the evidence in the light of all of the surrounding circumstances"). The State may use circumstantial evidence to prove premeditation if the "inferences supporting premeditation are reasonable and the evidence is substantial." *State v. Gregory,* 158 Wn.2d 759, 817, 147 P.3d 1201 (2006).

The evidence demonstrates that Raya Leon had motive to kill detective Brown to elude apprehension by law enforcement. Raya Leon's actions throughout the day leading up to the murder evidenced a commitment to avoiding being caught and a willingness to take dangerous and

reckless actions to do so. Throughout the day, the Raya Leons took countersurveillance measures to avoid being captured. And when police attempted a traffic stop with lights and sirens, the Raya Leons "went nuts" and drove dangerously to avoid apprehension. 5 VRP at 2155. They darted across three lanes of heavy traffic, onto the shoulder, then back across all three lanes. Law enforcement described the driving as "crazy, extremely fast. The zigzagging back across was deliberate, but weaving in and out of cars, traffic was very heavy." *Id.* At one point, they veered into the median, kicking up a big cloud of dust such that law enforcement thought they had crashed. When they corrected, they shot across all three lanes of traffic again, forcing other drivers to use evasive action to avoid disaster. This evidence demonstrates that Raya Leon had the motive of avoiding apprehension without regard for the safety of others and supports an inference of premeditation.

Kraabell testified that before Raya Leon left the apartment to approach Detective Brown, Misty handed him a gun saying, "check it out," and "no loose ends." 6 VRP at 2898. This reasonably supports an inference that Raya Leon left the apartment, armed with a firearm, intending to kill Detective Brown. Raya Leon contests the credibility of Kraabell's testimony. At trial, Raya Leon argued at length to the jury that Kraabell's testimony was not credible; credibility determinations are for the trier of fact, and we will not revisit them on review. *Cardenas-Flores*, 189 Wn.2d at 266. Moreover, a challenge to the sufficiency of the evidence admits the truth of the State's evidence. *Id*. at 265

While the presence of a weapon does not in itself prove premeditation, it can support an inference of premeditation. *Hoffman*, 116 Wn.2d at 83. Here, it is undisputed that Raya Leon intentionally armed himself before leaving the apartment to approach Detective Brown.

Specifically, he armed himself with a revolver, which was more powerful than the handgun he typically carried, and was known to not leave evidence at a scene. Armed with this weapon, Raya Leon approached Detective Brown from behind where Raya Leon would have the tactical advantage.

The evidence also demonstrates stealth. Raya Leon himself admitted that he purposefully took a circuitous route to approach Detective Brown's vehicle so that Detective Brown would not see him. Raya Leon told detectives, "I didn't want him seeing me so that I . . . can catch him off guard." Ex. 3 (Interview Tr.) at 1032. Evidence that the defendant attempted to hide himself from the victim prior to the attack may be considered evidence supporting an inference of premeditation. *State v. Barajas*, 143 Wn. App. 24, 36, 177 P.3d 106 (2007).

Additionally, despite it being a warm summer day and having worn shorts and a T-shirt throughout the day up to that point, Raya Leon put on a hooded sweatshirt to approach Detective Brown. Particularly, he put on a sweatshirt that had a kangaroo pouch pocket enabling Raya Leon to conveniently conceal his firearm but also easily access it when he got to Detective Brown. All of these facts support an inference of premeditation.

To support his argument, Raya Leon relies on his version of events—that he approached Detective Brown to determine whether he was a police officer, not with the intent to shoot him. He contends the shooting occurred "spur of the moment" such that he had no time to form the intent to kill. Br. of Appellant 38. But in a challenge to the sufficiency of the evidence, we take the evidence and reasonable inferences in the light most favorable to the State. And we defer to the jury on issues of conflicting testimony, witness credibility, and the persuasiveness of the

evidence. *Hernandez*, 172 Wn. App. at 543. Under these standards, sufficient evidence supported the jury's finding that Raya Leon had the premeditated intent to kill Detective Brown.

      2.      <u>Raya Leon knew Detective Brown was a law enforcement officer</u>

Raya Leon argues that the State failed to prove that he knew Detective Brown was a law enforcement officer at the time of the shooting, as required to prove the aggravated circumstance supporting his aggravated first degree murder conviction. We disagree.

To support the aggravated circumstance here, the State had to prove beyond a reasonable doubt that Raya Leon knew or reasonably should have known that Detective Brown was a law enforcement officer at the time of the killing. Former RCW 10.95.020(1).

*Hoffman* is instructive on this issue. There, the Supreme Court held that there was sufficient evidence to prove Hoffman knew or should have known the victim was a law enforcement officer. 116 Wn.2d at 87. The court emphasized, among other things, the fact that prior to the shooting, the defendant had eluded a police vehicle at high speed and thus knew law enforcement was likely looking for him. Similarly, here, Raya Leon knew that police were looking for him; he had spent the entire day conducting countersurveillance and eluding the police. And Raya Leon correctly identified undercover officers twice earlier in the day.

Raya Leon said in his interview that as soon as he spotted Detective Brown's vehicle, he believed he was an undercover officer. When Misty told Raya Leon she saw Detective Brown looking toward them with binoculars, Raya Leon felt his suspicions were confirmed, stating, "And then I was like man, I was like, I already knew, I was like, from there. 'Cause I already had a gut feeling that it's [f**king], you know, we were already just being followed." Ex. 3 (Interview Tr.)

at 1015. Indeed, his own explanation for approaching Detective Brown was because Raya Leon believed that Detective Brown was an undercover officer.

When Raya Leon approached Detective Brown's vehicle, he noticed Detective Brown's laptop and recognized it as a police laptop, which even further confirmed his belief that Detective Brown was a law enforcement officer. According to Raya Leon, this occurred before Raya Leon pulled out his gun, supporting an inference that by the time he drew his weapon, he knew that Detective Brown was a law enforcement officer. Raya Leon also admitted that as he ran away from the shooting, he understood that he had just shot or shot at a police officer.

Taking this evidence in the light most favorable to the State, a rational juror could have found beyond a reasonable doubt that Raya Leon knew Detective Brown was a law enforcement officer at the time he shot and killed him. Thus, there was sufficient evidence to support this finding.

3. Self-defense

Raya Leon also argues that the State failed to prove that he did not kill Detective Brown in self-defense. We disagree.

As previously discussed, sufficient evidence supported the jury's finding that Raya Leon killed Detective Brown with premeditated intent. That same evidence is sufficient to show that Raya Leon did not kill Detective Brown in self-defense, but rather approached Detective Brown while armed with a firearm and the premeditated intent to shoot him.

Additionally, given that sufficient evidence supported the jury's finding that Raya Leon knew Detective Brown was a law enforcement officer, under the unchallenged jury instructions, self-defense was only available to Raya Leon if Detective Brown used excessive force and Raya

Leon was in actual and imminent danger of death or great personal injury. *See State v. Bradley*, 141 Wn.2d 731, 737-38, 743, 10 P.3d 358 (2000).

But the evidence does not support a finding that Detective Brown used excessive force. Raya Leon's own expert witness testified that Detective Brown likely "reacted very quickly to a perceived threat and did not have much time to do anything else." 9 VRP at 4061. The expert testified that he believed Detective Brown fired appropriately.

Under these facts and taking all evidence in the light most favorable to the State, we hold that the State provided sufficient evidence to prove beyond a reasonable doubt that Detective Brown did not use excessive force, placing Raya Leon in actual and imminent danger of death or great personal injury. Thus, sufficient evidence supported the jury's finding that Raya Leon did not act in self-defense.

B.      First Degree Burglary

Raya Leon also argues that the State failed to prove beyond a reasonable doubt that he committed first degree burglary. We disagree.

RCW 9A.52.020(1) states that a person commits first degree burglary if they enter or remain unlawfully within a building with intent to commit a crime therein, and "in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person." A "deadly weapon" includes in part any "loaded or unloaded firearm." RCW 9A.04.110(6). Any firearm or explosive is a deadly weapon per se.

When the defendant had actual possession of a firearm during a burglary, sufficient evidence supports a first degree burglary conviction. *Hernandez*, 172 Wn. App. at 543-44. This is

true regardless of whether the firearm was unloaded or if there is no evidence showing that defendant intended to use it. *Id.* All that is required for a defendant to be armed is for the firearm to be "easily accessible and readily available for use . . . for either offensive or defensive purposes." *Id.* at 543.

Here, the evidence was sufficient to support a conviction for first degree burglary. In his interview with law enforcement, Raya Leon admitted to having a gun on him when trying to escape, including when he got to the house, and that it was the same one officers found on him when he was arrested. Additionally, Raya Leon acknowledged that he "had the Glock" with him when he stole the car from the home, using the keys that had been inside the house. Ex. 3 (Interview Tr.) at 1066.

Raya Leon argues that the evidence is equivocal and insufficient. He emphasizes that he only said he took a Glock to the house but did not say he brought it inside. But in a challenge to the sufficiency of the evidence, we take all the evidence in the light most favorable to the State, draw reasonable inferences in the States favor, and consider both circumstantial and direct evidence as equally reliable.

Based on the evidence that Raya Leon had the Glock when he arrived at the house and when he stole the car using keys that had been inside the house, it is reasonable to infer that he also had the Glock when he was inside the home. Taking the evidence in the light most favorable to the State, a reasonable juror could have found beyond a reasonable doubt that Raya Leon was armed with a deadly weapon during the course of the burglary. Thus, there was sufficient evidence to support the first degree burglary conviction.

No. 58921-4-II

CONCLUSION

In conclusion, we hold that the trial court did not err by giving a first aggressor instruction. We further hold that sufficient evidence supported Raya Leon's convictions for aggravated first degree murder and first degree burglary.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
MAXA, P.J.

_____
LEE, J.

22